568 So.2d 1360 (1990)
Sylvia Cosey CAZENAVE
v.
Dr. Rocky S. PIERCE & State of Louisiana, Department of Health and Human Resources, Charity Hospital of New Orleans.
No. 89-CA-1648.
Court of Appeal of Louisiana, Fourth Circuit.
October 11, 1990.
Writ Denied January 4, 1991.
*1361 Mary E. Howell, Howell & Snead, Mark G. Murov, Murov & Ward, New Orleans, for plaintiff-appellant.
George J. Ledet, Jr., Cut Off, Philip H. Kennedy, Sr. Atty., Bureau of Legal Services, Dept. of Health and Hospitals, New Orleans, for defendants-appellees.
Before WARD, ARMSTRONG and BECKER, JJ.
ARMSTRONG, Judge.
Plaintiff, Sylvia Cazenave, instituted this action against defendants, Dr. Rocky Pierce (Pierce) and the State of Louisiana, Department of Health and Human Resources (the State), for injuries resulting from an alleged intentional tort committed by Pierce on the premises of Charity Hospital of New Orleans (Charity). Following a bifurcated trial, the jury returned a judgment against Pierce, and the trial court dismissed plaintiff's suit against the State. Both plaintiff and Pierce now appeal.
The incident giving rise to this lawsuit occurred on November 15, 1979. Plaintiff was employed by Charity as an elevator operator. Pierce was a first year dental resident employed by Charity. It was approximately 6:45 a.m. and plaintiff was in her elevator taking on passengers on the first floor of the hospital. Pierce, enroute to the twelfth floor, attempted to board plaintiff's elevator just as she held out her *1362 hand and said "that's all." Pierce attempted to back up, but claimed he was struck by the elevator door which was controlled by plaintiff. This was denied by plaintiff and several other witnesses.
Pierce waited for plaintiff's elevator to return, passing up at least one opportunity to go up in another elevator. Pierce testified that he intended to confront plaintiff and chastise her about closing the old, heavy elevator door on him. When plaintiff returned, the two argued about whether or not plaintiff had closed the door on Pierce. Two different scenarios emerge, but it was not contested that thereafter an altercation ensued.
Plaintiff claimed, and the jury found, that she suffered a ruptured tendon in her left ring finger. She underwent five operations on the finger, including, finally, a fusion of the joint at the end of the digit. The jury awarded plaintiff a total of $95,984.83 plus interest for physical and mental pain and suffering, lost wages, and medical expenses.
On appeal plaintiff claims that the trial court erred in finding that the State was not liable for the action of its employee, Dr. Pierce.[1] Pierce cites several alleged errors. He argues that the trial court erred in its instructions and interrogatories submitted to the jury; in failing to consider the issue of plaintiff's comparative fault; and in awarding plaintiff an excessive amount of damages.

LIABILITY OF THE STATE
La.R.S. 23:1032 provides that worker's compensation shall be the sole remedy of an employee against her employer for injuries sustained as the result of an act of a co-employee unless, as alleged here, the injuries result from an "intentional act." Jones v. Thomas, 426 So.2d 609 (La.1983). "Intentional act" has been interpreted to mean an intentional tort. Bazley v. Tortorich, 397 So.2d 475 (La.1981).[2]
The basis for holding an employer liable for the acts of its employees is found in La.C.C. art. 2320 which states in pertinent part:
"Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."
. . . . .
"In the above cases, responsibility attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it."
The proviso contained in the second paragraph quoted above has been largely ignored by Louisiana courts. If there was an employment relationship, and the intentional act was committed during the course and scope of the actor's employment, vicarious liability attaches. Weysham v. New Orleans Public Service, Inc., 385 So.2d 19 (La.App. 4th Cir.1980), writ denied, 392 So.2d 690 (La.1980). It is not disputed that Pierce was employed by the State at the time of the incident in question. The dispositive issue is whether or not Pierce was acting in the course and scope of his employment.
In LeBrane v. Lewis, 292 So.2d 216 (La. 1974), the Louisiana Supreme Court set out four factors to be considered in determining whether an employee was acting in the course and scope of his employment when *1363 he committed an intentional tort. The four LeBrane factors were cited by the court in Miller v. Keating, 349 So.2d 265 (La.1977) as:
"(1) whether the tortious act was primarily employment rooted: (2) whether the violence was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises; and (4) whether it occurred during the hours of employment."
In LeBrane, a hotel employee was terminated by his supervisor for lingering around the hotel after being ordered to take the rest of the day off and get a haircutthe supervisor had authority to hire and fire employees. After terminating LeBrane, the supervisor escorted him up to the manager's office to get his termination pay. As the two rode down on the elevator from the office, a heated argument ensued, with the two men "more or less inviting each other outside." Once outside, the two began fighting. The fight ended with the supervisor stabbing LeBrane as he tried to run away.
Plaintiff seizes upon certain language in LeBrane to support what we feel is an overly broad interpretation of the phrase, "course and scope of employment." The LeBrane court found the supervisor's conduct was so closely connected in time, place, and causation to his employment-duties "as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests." Thus, plaintiff essentially argues, if the tortious conduct was not motivated by purely personal considerations entirely extraneous to the employer's interest, vicarious liability attaches. We disagree.
Commenting in Miller on its finding in LeBrane that the tort occurred in the course and scope of the supervisor's employment, the Louisiana Supreme Court noted that the supervisor's tortious act had:
"[E]volved out of a dispute relating to the employment, one which was reasonably incident to the [supervisor's] duties as a hotel employee, and one which was closely connected to those duties (rather than a purely personal matter) which prompted us to regard the incident as one where the risk of harm was fairly attributable to the employer's business."
Although the court here again uses the phrase "purely personal," it is clear that it does not mean to suggest that anything but a tort growing out of a purely personal matter is to be considered "primarily employment-rooted" and "reasonably incidental" to the performance of the actor-employee's duties.
In Miller, supra, the court held that all four factors need not necessarily be found for vicarious liability to attach. In Miller, the plaintiff, a former vice-president of the corporate defendant, was severely and brutally beaten outside his trailer home late one night by two men, employees of the defendant/employer. The attack occurred approximately three months after the plaintiff had left the employ of the company. Although the tort had not been committed on corporate property or during working hours, the court implicitly found that a conspiracy between the president of the company and the two attackers to murder the plaintiff was primarily employment-rooted. The men traveled to the plaintiff's home in company vehicles equipped with two-way radios to allow one vehicle to notify the other when plaintiff left his new place of employment to return home. The court also found that the tort was actuated in large part by the corporate president's desire to improve the financial picture of the businessthe corporation stood to receive a large sum of money in life insurance proceeds in the event of plaintiff's death.
In the instant case the alleged tort occurred on Dr. Pierce's employer's premisesthe third prong of the LeBrane test. It happened minutes before, and as he was proceeding to, his assigned rotation. Technically, he was on his way to begin his "shift." This is considered during the hours of Dr. Pierce's employmentthe fourth prong of LeBrane. See Serean v. Kaiser Aluminum & Chemical Corp., 277 So.2d 732 (La.App. 4th Cir.1973).
*1364 Plaintiff argues that Dr. Pierce's tort grew out of a desire by him to chastise her on behalf of his employer, Charity. Testimony at trial established that the old elevator doors were heavy. It appears that there was a possibility of injury should one of them strike someone. Dr. Pierce testified that after plaintiff allegedly struck him when she closed the elevator door, he waited for her to return "because I didn't think it was proper and appropriate for her to have done that under any circumstances." He confronted her, argued with her, and, as presumably found by the jury, attacked her. Dr. Pierce testified that he felt "it was [his] prerogative to call attention to an unsafe situation if he saw one." He admitted, however, that monitoring the "elevator situation" was not on his "job description." He also said that he had not been authorized to correct or reprimand an elevator operator.
A witness at trial, a former union representative, testified that prior to 1979 she had been aware of "problems" between elevator operators and persons using them. She said there was a lot of friction between the operators and other employees. One of the problems involved persons occasionally being struck by elevator doors. She also stated that these problems were brought to the attention of the hospital administration.
Testimony at trial established that in the past, in emergency situations, elevator operators had given doctors preferred treatment and taken them non-stop to a particular floor. There was no official rule requiring operators to do this, however. An associate director of medical care at Charity testified that medical residents had no authority over elevator operators. They had no particular elevators reserved for their exclusive useall elevators were available for use by patients, visitors, doctors, residents, nurses, and other hospital personnel.
Based upon this evidence, arguably, Dr. Pierce's tortious act was "reasonably incidental" to his employment duties, even though officially, he did not have the authority to chastise or correct elevator operators.
Based upon the jurisprudence, the tortious act by Dr. Pierce must be considered as having been "primarily employment-rooted." Dr. Pierce was attempting to go to the twelfth floor of the hospital to begin his assigned rotation. Plaintiff, acting to prevent an overload of her elevator, stopped him from entering and closed the door in his face, possibly striking him. Plaintiff testified that she had been previously disciplined by her employer for exceeding the capacity of the elevator. The act which indisputably set into motion the sequence of events culminating in Dr. Pierce striking plaintiff was performed in the interest of the parties' employer, Charity.
We clearly have present at least three of the four LeBrane factors. Arguably, we also have the fourth. In Miller the Supreme Court stated that there were "no magical requirements." The court noted that each question of vicarious employer liability must be looked at on its merits to determine whether the tortious conduct is to be regarded as within the course and scope of employment. Generally, courts have interpreted LeBrane in a liberal fashion, seemingly giving the aggrieved plaintiff the benefit of the doubt in close cases. Jones v. Thomas, 426 So.2d 609 (La.1983), was the first case to hold that the under La.R.S. 23:1032 as amended in 1976, a worker could sue her employer under the doctrine of respondeat superior for the intentional torts of a co-employee. In construing the statute the court stated:
"[A]n employer's absolute liability (whether personal or vicarious) for intentionally inflicted injuries could be considered as a possible legislative trade-off for absolute immunity for negligently inflicted injuries."
While we consider the court's statement in Jones to be dictum, it is somewhat illustrative of the liberal manner in which the courts have construed the intentional act exception and the phrase "in the course and scope of employment." There were apparent recurring problems between elevator operators and other Charity employees concerning the operation of the elevators. The tortious act grew out of just *1365 such a problem. The risk of harm that a Charity employee would assault an elevator operator is fairly attributable to Charity. Based upon the facts and circumstances before us, we find that Dr. Pierce was acting in the course and scope of his employment at the time he attacked plaintiff. The trial court erred in concluding that the state was not vicariously liable for the intentional tort of Dr. Pierce.

JURY INSTRUCTIONS AND INTERROGATORIES
Pierce contends that the trial court erred in instructing the jury and submitting an interrogatory to it as to the definition of an intentional tort, specifically, the meaning of intent. Pierce vaguely objects "to the instructions to the jury which discussed negligence." The jury instructions comprise some forty-five pages of the trial transcript. An examination of the instructions reveals no error as to the court's instructions regarding the issue of negligence.
In contrast to his vague assignment of error regarding the jury instructions, Pierce cites a specific interrogatory submitted to the jury. Interrogatory number one asked:
"Do you find that the November 15, 1979 altercation between plaintiff, Mrs. Slyvia Cazenave, and defendant, Dr. Rocky Pierce, was caused by the deliberate, wilful and/or wanton actions of Dr. Rocky Pierce?"
Pierce argues that this interrogatory could have been interpreted by the jury as allowing a finding of liability on his part even if the evidence established only his negligence or gross negligence. As a co-employee of Dr. Pierce, under La.R.S. 23:1032, plaintiff's remedy is limited to worker's compensation unless the tortious act was intentional. He submits that a proper definition of an intentional act (tort) was given by the Louisiana Supreme Court in Bazley v. Tortorich, 397 So.2d 475 (La. 1981), in which it carefully construed the meaning of the phrase "intentional act" as it is used in La.R.S. 23:1032. The court stated:
"The meaning of intent in this context is that the defendant either desired to bring about the physical results of his act or believed they were substantially certain to follow from what he did."
Plaintiff counters Pierce's argument by citing a subsequent case, Caudle v. Betts, 512 So.2d 389 (La.1987), in which the Supreme Court re-examined the issue of intent as it pertains to intentional torts perpetrated by an employee. The court referred to its discussion in Bazley, cautioning that in that decision it did not profess to set forth a complete exposition of intentional tort law. It went on to state that a court must apply legal precepts of general tort law related to the particular intentional tort involved in order to determine whether a plaintiff has proven his cause of action.
Bazley, Caudle, and the instant case all involve[d] batteries. The Caudle court noted that a defendant has historically been held liable for a battery not only for contacts that do actual physical harm, but also for those relatively trivial ones which are merely offensive and insulting. The intent need not necessarily be a hostile intent, nor is a desire to do any harm required. It is sufficient that the actor intended to inflict either an offensive or harmful contact without the other's consent. A defendant may be liable even though he believed that the act would not injure the plaintiff. Caudle v. Betts, supra, at 391.
Plaintiff also cites definitions in Black's Law Dictionary (5th ed. 1979) of the words used by the trial court in the interrogatory. "Deliberate" is defined in part as "[w]illful rather than merely intentional." Thus, deliberate can be interpreted as meaning something more purposeful than intentional. A "willful" (wilful) act is one "done intentionally, knowingly, and purposely ... as distinguished from an act done carelessly, thoughtlessly, heedlessly, or inadvertently. A willful act differs essentially from a negligent act." A "wanton" act is "equivalent in its results to wilful misconduct."
In addition to the interrogatories the trial court gave the jury detailed instructions. *1366 Although the court did not give the exact Bazley definition of intent, it did instruct the jury using language from Caudle v. Betts, supra. Considering the jury instructions, and the definitions of the words complained of in the interrogatory, we are unable to say that the trial court erred in giving that interrogatory to the jury.

QUANTUM
Dr. Pierce next contends that the jury's award of damages was excessivehe refers only to general damages as being excessive. Pierce also submits that plaintiff was a malingerer and exaggerated her symptoms. He further claims that "as a result of several instances of misdiagnosis, plaintiff had numerous surgeries performed on her finger which eventually resulted in a fusion of the finger." He maintains that the medical expenses were not attributable to him because of the instances of misdiagnosis, which began in the emergency room at Charity.
Plaintiff injured her finger on November 15, 1979 and was examined in the Charity emergency room. She was either misdiagnosed or under diagnosed as having a fractured finger. Later examinations revealed no indication that the finger had ever been fractured, although one physician indicated that it was possible that there had been a hairline fracture that healed and did not show up on later X-rays. Not until mid-January 1980 was the correct diagnosis madeplaintiff had suffered a ruptured tendon in the end of that finger.
On January 16, 1980 plaintiff underwent surgery to reattach the ruptured tendon, which had shrunk back into the palm of her hand. On February 14, 1980 plaintiff was admitted to the hospital complaining of severe pain. It was discovered that she had ruptured the tendon again, apparently while doing prescribed physical therapy exercises. A second surgery was performed to repair the tendon. Subsequently, plaintiff had a third surgery to reattach the tendon again. A fourth operation was later performed to remove scar tissue which had formed around the tendon.
In October 1981 plaintiff sought treatment from a third physician, also an orthopedic surgeon. In November 1981 this surgeon performed a fusion of the joint at the end of her finger. That surgeon, Dr. Lonsel Diodene Jr., recommended the fusion because plaintiff had not obtained significant relief from the previous operations and treatment. However, as late as August 1982 plaintiff continued to have pain in the finger. Subsequent to the fusion Dr. Diodene also discovered a "bursa" on plaintiff's right elbow, which he removed during another operation. He stated that as far as he knew, once the bursa was removed from plaintiff's elbow she had no further problems with it. He stated there was a possibility that the elbow could have been struck during the incident in question. Plaintiff had complained earlier about pain going up to her elbow. Dr. Diodene also testified that as of the time of trial plaintiff had stopped having problems with her finger, other than the disabling effect of the fusion.
The evidence does show that plaintiff's injury was in all probability misdiagnosed. The ruptured tendon wasn't diagnosed until almost three months after the incident. Dr. Diodene testified that when a tendon fails, after three or four weeks it has usually contracted so that if repaired, there are "problems afterward"he did not elaborate further. He testified that he would have done a fusion earlier, but said that was a medical judgment call upon which reasonable and competent physicians could differ. Also, if successful, the reattachment would have been preferable to a permanently fused digital joint.
Despite the testimony of Dr. Diodene regarding the problems that may arise when a ruptured tendon is left untreated as plaintiff's was, there was no specific opinion stated by him, or any other physician, as to the probability that plaintiff's condition was made worse by the delay in diagnosis and treatment. We find no support for Dr. Pierce's vaguely implied position that somehow plaintiff's medical expenses cannot be attributed to him because of the *1367 delay and subsequent route of treatment reattachment instead of fusion.
Dr. Pierce's argument as to general damages is directed to excessiveness in light of plaintiff's job training, education, and the medical evidence. Pierce refers to an award of "40,000.00 for general damages." Plaintiff was awarded general damages in the amount of $40,000.00 for (physical) pain and suffering, and $10,000.00 for mental anguish and emotional distress. These damages are completely unrelated to plaintiff's job training and education.
Pierce submits that the evidence clearly showed that plaintiff was a malingerer and grossly exaggerated her symptoms. The evidence did establish that the pain experienced by plaintiff exceeded in duration and amount that which would be considered normal or average. Plaintiff was given placebos on some occasions which had a positive effect in reducing pain. However, a physician testified that it is generally accepted that among persons actually suffering from pain, twenty percent will obtain relief from placebos. At least one of plaintiff's physicians testified that he did not feel that she was malingeringnone testified that they felt she was. Plaintiff at one point attempted to commit suicide because of the pain she was experiencing. Plaintiff's physical suffering also manifested itself on one occasion in her asking her physician to cut off the affected finger.
It is well-settled law that a tortfeasor takes his victim as he finds her. Reck v. Stevens, 373 So.2d 498 (La.1979); Kuck v. City of New Orleans, 531 So.2d 1142 (La. App. 4th Cir.1988). It doesn't matter that plaintiff may have been more susceptible to experiencing pain than the average person.
A trier of fact has much discretion in the assessment of general damages. La.C.C. art. 2324.1; Landy v. Smith, 542 So.2d 731 (La.App. 4th Cir.1989). Before an appellate court can disturb a trial court's award of general damages, the record must clearly reveal that the trier of fact abused its discretion in making the award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Harris v. Doucette, 539 So.2d 997 (La.App. 4th Cir.1989). If such an abuse of discretion is found, the court may look to other awards made in similar cases as an aid to raising or lowering the award to its highest or lowest point which would have been reasonably within the discretion of the jury. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., supra; Harris v. Doucette, supra.
The evidence reflects that plaintiff began experiencing pain shortly after the accident. Plaintiff underwent three operations to reattach the ruptured tendon. She also underwent an operation to remove scar tissue surrounding the tendon. Finally, a fusion was performed. We need not even consider the elbow operation. The evidence supports the apparent finding by the jury that plaintiff was not a malingerer, and we are unable to say that such a finding was clearly wrong. Canter v. Koehring, Co., 283 So.2d 716 (La.1973). Assuming that fact, the evidence supports the award of $40,000.00 in general damages for plaintiff's pain and suffering. We are unable to say that the trier of fact abused its discretion in making that award.

COMPARATIVE FAULTMITIGATION OF DAMAGES
By Dr. Pierce's final assignment of error he asserts that comparative fault should have been applied to reduce liability, as plaintiff was contributorily negligent. La.C.C. art. 2323 was amended in 1979 to provide for reduction of a tortfeasor's liability to his proportionate share of fault when it was less than that attributed to a contributorily negligent plaintiff. However, the effective date of the amendment was August 1, 1980, and a provision in the amending act, Acts 1979, No. 431, Section 4, states that it shall not apply to claims arising from events that occurred prior to the time the act became effective. See McDermott v. Jester, 466 So.2d 795 (La. App. 4th Cir.1985), writ denied, 468 So.2d 576 (La.1985). Plaintiff was injured on November 15, 1979, and therefore, Dr. Pierce may not have his liability reduced by any *1368 percentage of fault which may have been attributed to plaintiff.
Dr. Pierce also argues that plaintiff cannot recover damages for battery if the evidence establishes that she was at fault in provoking the incident, unless he retaliated using excessive force to repel the aggression. He also asserts that damages for a battery may be mitigated under certain circumstances by the plaintiff's conduct. He submits that the trial court erred in failing to instruct the jury as to the law as to these issues.
La.C.C.P. art. 1793(C) provides in part that:
"A party may not assign as error the giving or the failure to give [a jury] instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection."
See Cochrane v. Winn-Dixie of Louisiana, Inc., 447 So.2d 83 (La.App. 4th Cir. 1984), writ denied, 449 So.2d 1353 (La. 1984); Alexander v. Alton Ochsner Medical Foundation, 276 So.2d 794 (La.App. 4th Cir.1973), writ denied, 279 So.2d 695 (La.1973), cert. denied, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 474 (1973).
The record reflects that following the jury charge the trial court gave the parties an opportunity to make their objections for the record. Counsel for Dr. Pierce objected to the instructions and interrogatories only insofar as they did not, in his view, properly set forth the law on intentthis issue was the subject of Dr. Pierce's second assignment of error. Because Dr. Pierce's counsel did not object to the trial court's failure to instruct the jury or to submit a relevant interrogatory on the issues of mitigation of damages based upon plaintiff's actions, or justification for the tort, the doctor may not raise that failure as an assignment of error on appeal.
For the foregoing reasons we reverse the judgment of the trial court in part, and render judgment in favor of plaintiff, Sylvia Cazenave, against defendants, Dr. Rocky S. Pierce and the State of Louisiana, through the Department of Health and Human Resources, in solido. We affirm the judgment of the trial court in all other respects. Costs of this appeal are assessed equally between defendant/appellee/appellant, Dr. Rocky Pierce, and defendant/appellee, the State of Louisiana.
AFFIRMED IN PART, REVERSED IN PART, RENDERED.
NOTES
[1] Defendant, Pierce, also raises this issue as an assignment of error. However, Pierce has no standing to raise this issue.
[2] La.R.S. 23:1032 states in pertinent part:

"The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury, or compensable sickness or disease...."
"Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act."