595 So.2d 1242 (1992)
Alexander Peter SCAMARDO, Sr., and Jackie Scamardo
v.
NEW ORLEANS STEVEDORING COMPANY, Joel Alice Chutz Mumphrey, Gerald Chutz, John Alvin Chutz, II as Beneficiaries of the Succession of Wilhelmina R. Sheen, XYZ Insurance Companies, et al.
No. 90-CA-1752.
Court of Appeal of Louisiana, Fourth Circuit.
March 17, 1992.
*1243 Ivan David Warner, III, Carimi Law Firm, Metairie, for plaintiffs-appellants.
Gerald T. Gelpi, Charles A. Cerise, Jr., Randall C. Coleman, III, Gelpi, Sullivan, Carroll & Laborde, New Orleans, for defendants-appellants.
Hurtence M. Patterson, Law Offices of James J. Morse, New Orleans, for intervenor-appellee.
Before BYRNES, CIACCIO and ARMSTRONG, JJ.
BYRNES, Judge.
Flanagan Shipping Corporation appeals from the trial court's adjudication of liability against them based on negligence and Louisiana Civil Code article 2317 (unreasonably dangerous instrumentalities), and the award of damages in favor of Mr. and Mrs. Scamardo for $528,889.17, based on loss of *1244 consortium, general damages, lost past and future wages, and medical expenses. We affirm the decision on liability but amend the award of damages.

FACTS
Alexander Scamardo, an electrician with over thirty years of experience, had been an employee of Deubler Electric, Inc. ("Deubler Electric") since 1982, receiving pay of around $17.00 an hour. On October 24, 1986, Deubler Electric sent Mr. Scamardo to the gearshop of Flanagan Shipping Corporation ("Flanagan") to repair a compressor. Mr. Scamardo had been to Flanagan's facilities before but not to the gearshop. Upon arriving at Flanagan's, Mr. Scamardo spoke with a mechanic Larry Newby. Then Mr. Scamardo went to the compressor, which was located on a loft about six feet above the shop floor. He examined the compressor, returned to his truck for tools and parts, and completed a rewiring of the machine in two and one-half hours. After that job, Flanagan's shop foreman Edward Burgers asked Mr. Scamardo to examine another type of machine located in the shop's center. Mr. Scamardo determined he could not repair it at that time. Mr. Burgers then asked Mr. Scamardo to examine a hydraulic press. Mr. Scamardo proceeded to rewire and modify it. After completing that job, he asked Mr. Newby if the compressor had cut off. Mr. Newby told him it was still running. Mr. Scamardo stated he would need to check the pressure gauge and the rotation of the compressor to determine if it was working properly. Mr. Newby stated that the pressure gauge could be viewed from the shop floor and Mr. Scamardo began to follow him, looking for a spot from which to view it. While following Mr. Newby, Mr. Scamardo backed into a pit six-feet deep, eight-feet long and two-feet wide, located in the shop floor.
The pit was utilized by Flanagan's mechanics to repair vehicles. Instead of using a hydraulic lift to lift vehicles above a mechanic's head like a gas service station, Flanagan mechanics drove the vehicle over the pit and repaired it from below. When the pit was not in use, Flanagan employees placed four removable posts around it with a connecting rope running around the perimeter, as a safety measure to prevent persons from falling in. Also, Flanagan employees had painted a yellow warning stripe around the pit's edge.
However, Flanagan stipulated at trial that at the time of this accident, the yellow stripe was very faded. Flanagan's employee, Mr. Newby, testified the stripe was soiled and had not been repainted in several years and therefore the stripe was not easily observable. More importantly Flanagan stipulated that the four posts and protective rope were removed from around the pit. Flanagan's primary mechanic, Ellis Whitaker, stated he had been working in the pit on a fork lift that morning. In order to drive the lift over the pit, he had to remove the posts. When he finished his work, he parked the lift outside the shop. He did not replace the posts around the pit, therefore leaving it unprotected and open. Also, Mr. Whitaker testified that while attempting to nap after lunch, he saw Mr. Scamardo and Mr. Newby walking near the unprotected pit but did not warn them.
After the accident, Mr. Scamardo was examined by Dr. Lloyd Nugent at De La Ronde Hospital. Dr. Nugent's diagnosis included fractured ribs on Mr. Scamardo's right side and chest trauma. Mr. Scamardo was put in traction. Dr. Essam Elmorshidy took over for the recuperatory treatment. Dr. Elmorshidy's medical records showed that Mr. Scamardo suffered from injuries sustained to his neck, back, left hand and fractured right ribs. Upon recovering from his fractured ribs, Mr. Scamardo returned to work for a period of four months. However, he began to complain of dizzy spells. Dr. Diaz, who took over Dr. Elmorshidy's practice, testified that Mr. Scamardo suffered from a pre-existing condition of degenerative changes in the lumbar spine, but that the accident had exacerbated the condition, causing it to be symptomatic. He also testified the accident caused carpel tunnel problems in both of Mr. Scamardo's hands. Due to these injuries, Dr. Diaz concluded that Mr. Scamardo would be able to work *1245 only for four hours a day, and in a very limited capacity. Mr. Scamardo's psychiatrist, Dr. Sanders, stated that the accident caused a generalized anxiety order, which would prevent him from functioning normally.
On October 1, 1987, Mr. and Mrs. Scamardo filed suit based on this accident, seeking damages for personal injury and loss of consortium. The Travelers Insurance Company (Travelers) intervened as the worker's compensation carrier for Deubler Electric, seeking reimbursement for benefits paid to, or on behalf of, Mr. Scamardo. During the bench trial held from November 6 until November 14, 1989, Flanagan presented its medical, psychiatric, and economic experts, whose testimony generally contradicted the testimony of Mr. Scamardo's experts. On December 22, 1989, the trial court issued its judgement. The court adjudicated liability against Flanagan based on negligence and Louisiana Civil Code article 2317. The court awarded Mr. and Mrs. Scamardo damages of $528,889.17 in the following amounts:

Loss of Consortium (Mrs.
Scamardo) $ 30,000.00
General Damages $175,000.00
Past lost wages $104,559.00
Future lost wages $180,000.00
Medical Expenses $ 39,330.17
 ___________
 $528,889.17

Also, the trial court awarded Travelers $70,330.78 in recompensation. From that decision and damage award, Flanagan appeals.

ASSIGNMENTS OF ERROR
Flanagan contends that the trial court erred in: (1) finding liability against it pursuant to Civil Code article 2317 concerning unreasonably dangerous conditions; and (2) not finding comparative fault against Mr. Scamardo. Flanagan further claims that the trial court erred in awarding: (3) excessive lost past wages; (4) excessive lost future wages; and (5) Mrs. Scamardo's loss of consortium damages. Flanagan also argues that the trial court: (6) erred in determining the cause, consequences and extent of Mr. Scamardo's injuries; and (7) abused its discretion by awarding excessive general damages. We find merit with Flanagan's third and fifth assignments.

SCOPE AND COURSE

Civil Code article 2317
Flanagan argues that the unprotected pit was not unreasonably dangerous when balanced against its utility, and that Mr. Scamardo, an experienced electrician was negligent in not avoiding the pit. In its reasons for judgment, the trial court stated:
The court finds that the company policy was not followed. Company policy required Mr. Whitaker to replace the poles and rope around the open pit when he removed the lift machine prior to lunch. The Court further finds this omission constitutes the negligence that was the proximate cause of or played a substantial part in bringing about the accident or injuries sustained by Mr. Scamardo when he fell into the pit.
Likewise, the Court finds the defendant is liable under La.C.C. article 2317. The unprotected pit constituted an unreasonably dangerous condition and risk which created a duty on the defendant to warn the plaintiff of. Having failed to do so, the defendant is liable.
The Court does not find any victim fault on behalf of the plaintiff.
Louisiana Civil Code article 2317 states:
We are responsible not only for the damage occasioned by our act, but for that which is caused by the act of persons for which we are answerable or of the things which we have in our custody. This however is to be understood with the following modification.
In an action asserting strict liability under La.C.C. article 2317, the Louisiana Supreme Court stated in Sistler v. Liberty Mutual Insurance Co., 558 So.2d 1106, 1112 (La. 1990), three conditions which must be proved:
1) the thing which caused damages was in the care, custody and control of the defendant;
2) the thing had a vice or defect which created an unreasonable risk of harm; and

*1246 3) the injuries were caused by a defect.
The plaintiff asserting negligence liability under LSA-C.C. art. 2315 has the same burden plus the additional burden of proving the defendant's scienter, i.e., the defendant knew or should have known of the defect. Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982); id. at fn. 7. The trial court determined that the unprotected pit constituted an unreasonably dangerous risk under article 2317. The standard of review of the fact findings of the trial court was stated by the Supreme Court in Sistler, supra at 1111-1112:
Absent "manifest error" or unless it is "clearly wrong", the jury or trial court's findings of fact may not be disturbed on appeal. This standard is set forth in Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973), as follows:
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trier of fact, on review the appellate court should not disturb the factual finding in absence of manifest error ... [W]here there is conflict of testimony, reasonable evaluation of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are as reasonable ..."
Thus, the appellate court's disagreement with the trial court alone is not grounds for substituting its judgment for that of the trier of fact. Borden Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081 (La.1983). If the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rossell [v. ESCO, 549 So.2d 840 (La.1989) ], supra. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The pit was about six-feet deep, eight-feet long, and two-feet wide and located in the shop floor of Flanagan, under its custody and control. In determining whether the pit represented an "unreasonable" risk of harm, "[i]t becomes the interpreter's duty to decide which risks are encompassed by the codal obligations from the stand point of justice and social utility." Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983). The judge must consider the moral, social and economic values as well as the ideal of justice in executing this duty. Id. Mr. Scamardo was an invitee of Flanagan. His sole purpose in the gearshop was to serve Flanagan in repairing its machines. He testified that he had not entered the gearshop before this accident which the record, contrary to Flanagan's contention, does not contradict. Thus, Flanagan was in a better position than Mr. Scamardo to detect, protect against, or eliminate the potential danger arising from an open hole in a traversed area of its shop floor. King v. Louviere, 543 So.2d 1327 (La.1989). Protection in this case could have been provided by a simple warning.
Reasonableness of the risk of the thing is determined by balancing the probability and magnitude of the risk against the utility of the thing. Entrevia, supra; Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980). The magnitude of the risk is exemplified by Flanagan's policy prior to the accident. Mr. Whitaker and Mr. Newby testified that company policy, as discussed in safety meetings, required employees to replace the four poles and rope back around the pit when it was not covered by a vehicle. Also, the company had painted a large yellow stripe around the pit's perimeter. Mr. Whitaker testified that he ignored company policy. He testified that he knew that the pit was uncovered when he was on his lunch break, while he was napping, and when Mr. Scamardo was walking backwards near the pit. Mr. Newby testified and Flanagan stipulated that the yellow stripe had not been repainted in at least a year, and was dull. Also, the stripe was soiled, making it even less visible as a warning signal. Flanagan contends the utility of the pit outweighs this *1247 unreasonably dangerous situation but the combination of facts discussed show otherwise. As a matter of law under LSA-C.C. art. 2317, the six-feet deep, eight-feet long, and two-feet wide pit, in its traversed area, which was uncovered, unprotected against, or for which warning was not otherwise given, was unreasonably dangerous. In this case the pit's utility for repairing vehicles does not outweigh its dangerous condition to invitees.
Flanagan cites several cases which it contends are contrary to our above analysis. However, these decisions deal with significantly different situations. In Entrevia, supra, the plaintiff was a trespasser, therefore committing a reprehensible action, and thus the Supreme Court could not rule in favor of the plaintiff. In this case Mr. Scamardo was an invitee of Flanagan, in Flanagan's shop, to perform valuable repair services for Flanagan. In Davidson v. Shreveport Yacht Club, Inc., 535 So.2d 1192 (La.App. 2nd Cir.1988), writ denied 537 So.2d 1162 (La.1989), the court found a fishing cable was not unreasonably dangerous though it stretched across a path at ankle height. However, the court based its finding on the facts that the plaintiff, an experienced fisherman, not only should have been aware of such obstructions near boat docks, but that he was relatively familiar with the area and had traversed over the cable. Flanagan did not show that its pit was typical of pits commonly found in gearshops so that Mr. Scamardo should have been knowledgeable of its existence somewhere in the shop. Also, Mr. Scamardo had not been in the Flanagan gearshop before this particular job. Finally, he was not knowledgeable of the pit itself. Thus, the result of Davidson does not apply here.
However, this court does agree with Davidson's analysis that the degree to which a danger may be observed by a potential victim who can provide self protection is one factor in determining whether a condition is unreasonably dangerous. Davidson, supra; Wallace v. Slidell Memorial Hospital, 509 So.2d 69 (La.App. 1st Cir.1987); Smith v. Hartford Accident and Indemnity Co., 385 So.2d 858 (La.App. 1st Cir.1980). But in this case the pit was not observable to Mr. Scamardo. Mr. Scamardo's primary job in the gearshop was to repair the compressor in the loft. Flanagan contends that Mr. Scamardo should have noticed the pit while fixing the compressor or performing his other repairs. Yet, in rewiring the compressor, his attention would be directed upon it and not upon the activities occurring on the shop floor. While the record presents a permissible view that Mr. Scamardo would have glanced downward during his job, Mr. Whitaker testified that he had parked the fork lift over the pit during the morning. The depression of the pit might not be noticeable to the casual observer without specific reason for a more focused attention. Since he neither had reason to look for the pit, as he was not warned, nor reasonably expected the pit to be there, the trial court could have concluded he did not have knowledge of it. Even if Mr. Scamardo had glanced over the pit once, ... "the `reasonable man' is permitted an occasional lapse of memory." Soileau v. South Central Bell Telephone Co., 406 So.2d 182, 183 (La.1981). In this determination the trier of fact's choice cannot be manifestly wrong. Rosell, supra. Thus, the results of these cases have no bearing here.
There is no liability under article 2317 if the plaintiff's fault caused his injuries. Entrevia v. Hood, 427 So.2d 1146 (La.1983). Since the trial court found that Mr. Scamardo was unaware of the pit, and had no reason to be aware of it, Flanagan cannot avail itself of this defense. Thus, Flanagan's contention that its pit was not an unreasonably dangerous risk under LSA-C.C. article 2317 does not have merit.

COMPARATIVE FAULT
In its Reasons for Judgement, the trial court stated:
The Court does not assess any negligence on behalf of the plaintiff Mr. Scamardo because it does not seem unreasonable for Mr. Scamardo to have been following Mr. Newby and trying to locate *1248 and read the gauge from the floor level when he fell into the pit.
Accordingly, the court assessed 100 percent fault and negligence against Flanagan. In Soileau v. South Central Bell Telephone Co., 406 So.2d at 183-184, the court stated:
Negligence is a failure to observe or do something that one ought to have observed and done, and would have done or noticed with ordinary care. Plaintiff is held to have seen that which he should have seen.... Contributory negligence is a matter of fact to be determined in the light of the circumstances in each case.
In Hammer v. Combre, 503 So.2d 624, 625-626 (La.App. 4th Cir.1987) this court stated the standard of appellate review for the determination of comparative negligence:
It is well settled that the allocation of comparative negligence is a factual matter lying within the discretion of the trial court, and such determination will not be disturbed on appeal in the absence of manifest error. Rawls v. Morris, 470 So.2d 531 (La.App. 1st Cir.1985).... "Manifestly erroneous in its simplest terms," means "clearly wrong". We said, then, that the appellate court should not disturb such a finding of fact unless it is clearly wrong.
Also see Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985); Arceneaux, supra. In Watson, the Supreme Court cited the provisions of the Uniform Comparative Fault Act, (2)(b):
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
The Court listed various factors which may influence the degree of assigned fault:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger;
(2) how great a risk was created by the conduct;
(3) the significance of what was sought by the conduct;
(4) the capacities of the actor, whether superior or inferior;
(5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought;
(6) other traditional considerations, i.e., last clear chance, fault, negligence, etc.
Mr. Scamardo had started toward the loft to view the pressure gauge when Mr. Newby indicated that the gauge could be viewed from the shop floor. Mr. Newby had Mr. Scamardo follow him, looking upward for the gauge, which was located ten feet off the ground. Mr. Whitaker saw the two men looking for something around the pit that he left uncovered. Mr. Scamardo reasonably could have relied on Mr. Newby to direct plaintiff to avoid the pit. Mr. Whitaker could have notified the men. As already determined, the unprotected pit was unreasonably dangerous. The ability to notify rested with Flanagan's employees. Mr. Scamardo was unaware of the danger. The risk created by leaving the pit unprotected greatly outweighs any action by Mr. Scamardo. Company policy was not followed. This combination of facts leads us to conclude that the trial court did not commit manifest error in not allocating any comparative fault to Mr. Scamardo. Thus this contention has no merit.
In its third assignment of error, Flanagan contends the trial court erred in awarding excessive lost wages from the date of the accident when the evidence established Mr. Scamardo worked four months after his accident at his regular job. We agree.
In its Reasons for Judgment, the trial court stated:
Dr. Wolfson was called as an economist who testified that Mr. Scamardo's past lost wages from the date last worked until the date of trial was $104,559.00. This was controverted by Dr. Boudreaux who testified that the lost wages were considerably less.
The Court rejects the opinion of Dr. Boudreaux and accepts the opinion of Dr. Wolfson.
*1249 This court has stated that in determining wage losses, the trial court should use pre-tax income. Harris v. Tenneco Oil Co., 563 So.2d 317 (La.App. 4th Cir.1990), writ denied 568 So.2d 1062 (La. 1990). Dr. Wolfson, Mr. Scamardo's economist, testified that Mr. Scamardo sustained lost wages of $119,000.00 gross income, before taxes. Mr. Scamardo claims that the trial judge then subtracted from that figure the wages Mr. Scamardo earned from his four months of work in 1987. However, this is clearly wrong. Dr. Wolfson testified that:
That calculation was made by taking the period of time and first multiplying it by thirty-four eight fifty-three. That's roughly, roughly three years since October of '86 to the present time. I rounded it off to three years. That's a hundred four thousand five fifty-nine. My appreciation is that the mandatory contribution to fringe benefits for the health, the welfare and the pension were $1.60 an hour. If one multiplies that by two thousand base rated straight time hours, it's about $3,200, 9.46 percent of his earnings. In addition to that, there was a six percent factor that is included for the vacation plan. ... which I calculated from the table, rounding it off was $119,412,... pre-tax basis. [Emphasis added].
* * * * * *
... We need to subtract whatever he made in 1987 from those figures.
Dr. Wolfson's testimony clearly shows he deduced the lost past wages of $104,559.00 after subtracting the amount for fringe benefit contribution but that he was not aware Mr. Scamardo had worked for four months after the accident, and that any wages earned afterwards would need to be deducted from his figure. Thus, we reduce the award of past wages by subtracting Mr. Scamardo's earnings in 1987, which were $9,989.14. Therefore the amended award for past lost wages, pre-tax is $94,569.86.
In its fourth assignment of error, Flanagan contends the trial court abused its discretion in awarding excessive future wages. Flanagan argues that the trial court accepted several incorrect computation standards put forth by Dr. Wolfson, and denied the correct standards of Dr. Boudreaux, Flanagan's economist. Also, Flanagan contends that the trial court erred in concluding Mr. Scamardo could only work four hours a day in his future, at a minimum wage level job. As to factual determinations and witness credibility, the standards set forth in Rosell, supra, and Sistler, supra, apply. However, the appellate review standard for the determination of the award and its components is the abuse of the trial court's discretion. Pisciotta v. Allstate Insurance Co., 373 So.2d 532 (La.1979), rehearing 385 So.2d 1176 (La.1979); Coco v. Winston Industries Inc., 341 So.2d 332 (La.1976).
In its Reasons for Judgment the trial court stated:
In determining future wages or the value of the diminished earning capacity of Mr. Scamardo, the Court applies the jurisprudential test that this cannot be calculated with a mathematical certainty but should be determined after consideration of plaintiff's physical condition prior to the accident, his work record, amount of his earnings in previous years, the probability or improbability that he would have earned similar amounts during the remainder of his work life if he had not sustained the injury for which he filed this lawsuit. The Court also considers the factor of the motivation of the plaintiff to return to work, the decreasing purchasing power of the dollar and either the net or gross wages of the plaintiff.
The court makes a finding that the plaintiff is able to work a maximum of four hours each day not to exceed twenty hours per week at a minimum wage salary.
The Court therefore finds that an award of $180,000.00 for future lost wages or diminished earning capacity is adequate.
Flanagan contends that the trial court should not have rejected the testimony of Dr. Boudreaux in favor of Dr. Wolfson. A *1250 review of their testimony shows that while both doctors are qualified economists, Dr. Wolfson attempted a more accurate and modern approach to calculate Mr. Scamardo's future wage loss. On the issue of the wage base, Flanagan contends the trial court should have accepted a view that included year 1982 when Mr. Scamardo was employed, the ten months of 1986, the year Mr. Scamardo was injured, and the four months of 1987, when Mr. Scamardo returned to work from traction and recuperation but began complaining of dizziness. Dr. Wolfson did use the average of 1986 and 1985, the most recent year of full employment, to determine his base of $34,853.00. The average of the three previous years of 1983, 1984, and 1985 was $35,614.00. We find Dr. Wolfson's choice and figures reasonable. On the issue of the wage rate increase Dr. Wolfson applied 4.2 percent instead of the Louisiana Worker's 6 percent average increase over the past thirty years, due to Mr. Scamardo's age. We find that reasonable. On the issue of the discount rate, Flanagan contends the court should have accepted the 7.9 percent treasury bond rate, but Dr. Wolfson used 7.5 percent because he took the 5½ percent bank savings rate into account, which we find reasonable. Flanagan contends the court should have rejected Dr. Wolfson's approach because it utilized U.S. Life Expectancy tables instead of U.S. Work Life Expectancy Tables. Dr. Wolfson reasoned that the Work Life tables were presently inaccurate, and his system of discounting per year work expectancy based on unemployment, illness, strikes, industry conditions, and time out of the labor force is reasonable and permissible. He reduced Mr. Scamardo's ability to work after age 69 to nil, reduced 80 percent of his work potential per year from age 65 to 69, and 331/3 percent from 55 to 64. We agree with Flanagan that the minimum wage of $4.25 should have been used by Dr. Wolfson in his calculations after April, 1991. However, this is one factor amongst all the others. Examining the totality of the testimony Dr. Wolfson's figures more reasonably responded to Mr. Scamardo's potential future earnings. Where either economist's view is permissible, we will not reverse the trial court's choice of one of them. Rosell, supra; Arceneaux, supra.
Flanagan contends that the trial court erred in finding Mr. Scamardo could only work for four hours a day in a limited capacity in the future. Mr. Scamardo returned to work for a four month period from February 10, 1987 to June 2, 1987. He stated he had to discontinue this work due to the previously sustained injuries. Shortly after the accident he began to experience dizziness. Mr. Risey, Mr. Scamardo's audiologist, Dr. Occhipinti, and Dr. Edrington, concluded that Mr. Scamardo's dizziness was caused by a central vestibular dysfunction leading into the brain stem. Mr. Scamardo's doctors concluded the dysfunction was more likely than not caused by the trauma of the accident. Dr. Occhipinti thought Mr. Scamardo was totally disabled due to possible sudden losses of orientation. Dr. Diaz testified that Mr. Scamardo could perform minimal labor employment for four hours a day. He testified:
With the degeneration he has in his back, with the muscle spasms we detected and with the examination, I would restrict him as far as weights are concerned, no lifting greater than ten, twenty pounds, no twisting, no climbing or frequent bending, sitting should be intermittent, alternating.
Dr. Cary, Flanagan's expert, testified he only saw Mr. Scamardo once, on February 19, 1987, immediately after he began working. He also testified he did not see the x-rays one year from the date of the accident so he could not tell whether Mr. Scamardo's arthritic condition had accelerated. The trial court could reasonably evaluate the testimony in favor of Mr. Scamardo's witnesses. Dr. Elmorshidy testified at his deposition that Mr. Scamardo complained on June 1, 1987 that his back pain was growing worse over time. On June 3, 1987, he was readmitted to the hospital and placed in traction. On June 22, 1987, Mr. Scamardo began to experience neck pain and headaches. Flanagan's expert, Dr. Dabezies, testified in his deposition that he saw Mr. Scamardo only once, on July 29, *1251 1988. He suggested to Mr. Scamardo to have himself retrained for a more sedentary job. He based this on the accident, degenerative changes, and the over-riding emotional problems Mr. Scamardo suffered due to not working. Finally, Dr. Dabezies responded affirmatively that the accident caused Mr. Scamardo's pre-existing condition to become aggravated and symptomatic based on the facts, presented in hypothetical form, that he worked thirty-five years not experiencing previous back pain, experienced a fall of six to seven feet and that the pain had not subsided. While Flanagan objected at the time, those facts do represent the case here. A review of the record in its totality, including the depositions and testimony, shows that the trial court could have reasonably rejected the testimony of Flanagan's expert witnesses in favor of Mr. Scamardo's witnesses. Absent a finding of manifest error, we cannot reverse the trial court's factual conclusions. Thus, the trial court did not abuse its discretion in awarding lost future wages based on Dr. Wolfson's testimony, on the enumerated jurisprudential factors, or on the basis that Mr. Scamardo could only return to a limited work capacity of minimum wage labor at four hours a day. Therefore, assignment four has no merit.
In its fifth assignment of error, Flanagan contends the trial court erred in awarding Mrs. Scamardo consortium damages. Flanagan argues that the damages are based on the "exacerbation of family dynamics," which does not represent legal basis for recovery. Alternatively, Flanagan argues the testimony supports a finding that Mr. and Mrs. Scamardo's relationship improved as a result of the accident. In its Reasons for Judgment, the trial court stated:
The Court awards Mrs. Scamardo $30,000.00 for her loss of consortium as a result of the injuries sustained by Mr. Scamardo. The Court finds this sum to be adequate under the circumstances.
Although, the Scamardo's family was having internal conflict prior to the accident the Court finds that the accident so exacerbated the family dynamics and the relationship within the family that an award of $30,000.00 is justified and adequate.
Loss of consortium must be based on such elements as:
(1) loss of service;
(2) loss of love and affection;
(3) loss of society and companionship;
(4) loss of sexual relations;
(5) loss of support; and
(6) loss of overall contentment and happiness.
Vaccaro v. Sports and Imports, Inc., 539 So.2d 989 (La.App. 4th Cir.1989), writ denied 541 So.2d 1391 and 541 So.2d 1392 (La.1989); Tracy v. Jefferson Parish Through Dept. of Public Works, 523 So.2d 266 (La.App. 5th Cir.1988), writ denied 530 So.2d 569, reconsideration denied 532 So.2d 141 (La.1988); Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144 (La.App. 3rd Cir.1990) writ denied 565 So.2d 450 (La. 1990). Overall, from the record we conclude that the accident had only a moderate effect upon the Scamardo's relationship, and that their problems pre-existed the accident. The record does not support Flanagan's contention that the relationship improved after the accident.
The record shows that the marital relationship was in such a state before this accident as to cause Mrs. Scamardo to develop ulcers, to take several strong medications, and to seek psychiatric counselling over extended periods of time. She had been diagnosed with a major depression-recurrent. The Ponchartrain Mental Health Center records contradicted her testimony to the contrary. The records reflected that the Scamardos previously had a poor sexual relationship. Their companionship for such things as bowling had ceased prior to the accident. Communication had broken down before the accident. Mrs. Scamardo admitted that she had previously given up much of her social life. These facts brought out in cross-examination were supported by Mrs. Scamardo's psychiatrist Dr. Dozier. Ms. Laughlin, a social worker, testified in support of Mrs. Scamardo. However, her testimony and records reflect she was unaware of many *1252 major issues in the Scamardo household, such as Mrs. Scamardo's past psychiatric history and Mr. Scamardo's returning to work after the accident. Yet, having considered the accident must have contributed to the further increase of overall discontentment and unhappiness, we find that Mrs. Scamardo is entitled to some compensation for the loss of consortium, but her loss does not merit the award made by the trial court. In accordance with recent decisions involving loss of consortium, $15,000 is the highest award we believe reasonably rested in the trial court's discretion. Thus we amend the award for loss of consortium to $15,000.
In its sixth assignment of error, Flanagan contends the trial court committed manifest error in determining the causation, consequences, and extent of Mr. Scamardo's injuries. We have already examined the issue concerning the reasonableness of the trial court's conclusions of fact about Mr. Scamardo's injuries in Flanagan's fifth assignment. Dr. Cary and Dr. Dabezies both had only examined Mr. Scamardo once. Dr. Cary had not seen x-rays, which would provide necessary information, to make judgments concerning the effect of the accident, one year later. Dr. Dabezies admitted in his deposition that under a fact situation, much like we have, it was likely the accident had caused the pre-existing conditions to become aggravated and symptomatic. The record concerning Mr. Risey, Dr. Occhipinti and Dr. Edrington supports that Mr. Scamardo's dizziness was caused by central vestibular dysfunction. Dr. Elmorshidy testified that Mr. Scamardo's pain and dizziness grew worse over time. Dr. Diaz confirmed that the accident caused Mr. Scamardo's inability to return to his normal worklife. Flanagan argues that Mr. Scamardo did not complain of many of his problems until long after the accident, supported by the testimony of Dr. Nugent, Dr. Vogel, Dr. Sanders, and Dr. Elmorshidy. This does not invalidate the fact that the accident was the cause of Mr. Scamardo's problems. Not all injuries are immediately apparent. Under the standards of Rosell, supra, and Sistler, supra, we cannot find the trial court's conclusions were unreasonable. Thus, this assignment has no merit.
In its seventh assignment of error, Flanagan contends the trial court abused its discretion by awarding excessive general damages. Flanagan argues that the award is based on facts not supported by the evidence.
In order for the appellate court to disturb a damage award, the record must clearly reveal that the trier of fact abused its discretion in making its award. LSA-C.C. art. 2324.1; Coco v. Winston Industries, 341 So.2d 332 (La.1976). Only after a determination of abuse has been reached is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award in the present case. Reck v. Stevens, 373 So.2d 498 (La.1979); Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La. 1991). The reviewing court must evaluate the particular injuries and their effects on the particular injured persons. Reck, supra. The tort-feasor takes the victim as he finds him. Cazenave v. Pierce, 568 So.2d 1360 (La.App. 4th Cir.1990); Arruebarrena v. Boh Bros. Const. Co., 539 So.2d 78 (La. App. 4th Cir.1989). Using these criteria, we find that the trial court did not abuse its discretion in its general damage award for the injuries Mr. Scamardo sustained.

CONCLUSION
We affirm the trial court's finding of liability pursuant to Civil Code article 2317, and lack of finding of comparative fault. We affirm the award of general damages, and future wages. However, we reduce the award of lost past wages to reflect the wages earned in the four months Mr. Scamardo worked in 1987. Thus we reduce the lost past wages award by $9,989.14 to total $94,569.86. Also we reduce the award for loss of consortium to Mrs. Scamardo from $30,000 to $15,000.00. The trial court's total award of $528,889.17 is reduced to $503,900.03. In all other respects, the decision of the trial court is *1253 affirmed. Costs are assessed against the defendant.
AMENDED AND AFFIRMED.