681 So.2d 1292 (1996)
TERREBONNE FUEL & LUBE, INC.,
v.
PLACID REFINING COMPANY.
No. 93-CA-2364.
Court of Appeal of Louisiana, Fourth Circuit.
October 2, 1996.
*1294 C. Berwick Duval, II, Duval, Funderburk, Sundbery & Lovell, L.L.P., Houma, for Plaintiff.
James G. Burke, Jr. and Robert D. Hoffman, Jr., Burke & Mayer, New Orleans, for Defendant.
Before BARRY, LOBRANO and ARMSTRONG, JJ.
ARMSTRONG, Judge.
This case comes before us for the second time. On a previous appeal, we held that the plaintiff's claim was barred by res judicata. The Supreme Court reversed (See Terrebonne Fuel & Lube, Inc. v. Placid Refining Company, 95-0654 (La.1/16/96), 666 So.2d 624, held that the plaintiff's claim was not barred by res judicata, and remanded to us for consideration of the merits.) We now address the merits.
This case involves an alleged wrongful foreclosure. Defendant Placid Refining Company ("Placid") sold diesel fuel, on credit, to plaintiff, Terrebonne Fuel and Lube, Inc. ("Terrebonne") pursuant to a contract titled "Diesel Fuel Purchase and Credit Agreement" (Plaintiff's Exhibit 1, "the Fuel Agreement"). The credit sales were secured by several security instruments which gave Placid liens on Terrebonne's principal bank account, its accounts receivable and its diesel inventory. At or just prior to the expiration of the one-year term of the Fuel Agreement, at a time when Terrebonne was admittedly late on $298,599 it owed to Placid, Placid caused Terrebonne's principal bank account to be frozen and sent notices to Terrebonne's account debtors to make payments directly to Placid. Although Placid never actually withdrew money from Terrebonne's principal bank account or collected many of Terrebonne's accounts receivable, Placid's actions to begin enforcement of its security rights caused Terrebonne to file for Chapter XI bankruptcy reorganization with resulting adverse financial and business consequences for Terrebonne.
Terrebonne brought the present action and alleges that Placid breached the Fuel Agreement by enforcing its security rights as it did. Placid filed a reconventional demand and alleges that Terrebonne misrepresented the amount of its collateral in order to obtain additional credit.
After a bench trial, the trial court found that Placid had breached the Fuel Agreement by enforcing its security rights without first giving five days written notice to Terrebonne. The trial court rejected Terrebonne's contention that, with the five days notice, it could have refinanced its delinquent debt to Placid and so avoided Chapter XI bankruptcy reorganization but, nevertheless, fixed damages for the failure to give the five-day written notice at $500,000. The trial court also found that Terrebonne had not misrepresented the amount of its collateral and so dismissed Placid's reconventional demand.
We hold that Placid did not breach the Fuel Agreement by enforcing its security rights without first giving five days written notice to Terrebonne. Also, we are unpersuaded by Terrebonne's other arguments that Placid acted wrongfully when it enforced its security rights. Further, even if Placid had breached the Fuel Agreement by not giving five days notice, the trial court's finding of fact that Terrebonne could not have *1295 refinanced its delinquent debt in five days precludes the possibility of any damages being caused by such lack of notice. As to Placid's reconventional demand, the trial court's finding of fact that Terrebonne did not misrepresent the amount of its collateral is not clearly wrong or manifestly erroneous. Thus, as to the principal demand, by Terrebonne against Placid, we reverse the judgment of the trial court. As to Placid's reconventional demand, we affirm the judgment of the trial court.
The interpretation of a contract is the determination of the intent of the parties to the contract, La. Civil Code Art. 2045, but: "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civil code art. 2046. The issue of whether the words of a contract are "clear and explicit", or are instead ambiguous, is a question of law and, as such, is subject to de novo consideration on appeal. Welsh v. Paul Revere Life Ins. Co., 95-CA-0954 (La.App. 4th Cir. 11-30-95), 665 So.2d 142, 144-45, writ denied, 96-C-0403 (La. 3-22-96), 669 So.2d 1214, McCrory v. Terminix Service Co., 609 So.2d 883, 886 (La.App. 4th Cir.1992). As we will discuss in detail below, we find that the Fuel Agreement provisions at issue are "clear and explicit" and are not ambiguous.
"When the meaning of the words [of a contract] are clear then the courts should look no further in determining the intent of the parties.... Where the meaning of a contract is to be determined solely from the words upon its face, without the necessity of extrinsic evidence, the appellate courts are as competent to review the evidence as the trial court, and no special deference is usually accorded the trial court's findings." Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La. 1991). Thus, as the Fuel Agreement provisions at issue are clear and explicit, their meaning is determined by us de novo. As we will discuss in detail below, those provisions gave Placid the right to enforce its security rights without giving prior notice to Terrebonne.
The Fuel Agreement was entered into on April 29, 1985 and had a one-year term. In it, Placid agreed to sell to Terrebonne up to 50,000 barrels of diesel per month. Placid was to invoice Terrebonne for each delivery of diesel and payment was "due and owing" sixty-five days after delivery. If any payment were late, it would bear interest. Payment could be made by offset of amounts owed by Placid's corporate parent, Placid Oil Company, to Terrebonne. (It was contemplated, and it in fact occurred, that Placid Oil Company's vessels in the Gulf of Mexico would be purchasing diesel from Terrebonne.) If Terrebonne paid any invoices early, i.e. less than sixty-five days after the delivery of the diesel, then Terrebonne would be given a credit to be calculated pursuant to a formula set out in the Fuel Agreement.
Section 2.05 of the Fuel Agreement made a number of provisions for security for the extension of credit to Terrebonne by Placid. It provided that: (1) Placid would be given a first lien position on Terrebonne's accounts receivable arising after the beginning of the Fuel Agreement; (2) Terrebonne would establish a bank account to which Terrebonne's account debtors would send payment and that Placid would have "signatory rights" on that bank account (i.e. the right to make withdrawals) as well as, apparently, a lien over the cash in that bank account as proceeds of the liened Terrebonne accounts receivable; and (3) a first lien position on Terrebonne's inventory acquired after the beginning of the Fuel Agreement. All three of these security rights were to be, and in fact were, documented by separate security instruments. Terrebonne's credit, i.e. the total credit that could be outstanding at any one time, was limited by the amount of the collateral subject to the three security rights. Thus, Section 2.06 of the Fuel Agreement provides for certain reports to be made by Terrebonne to Placid as to the collateral.
Section 2.05 of the Fuel Agreement, with its various provisions for the security to be given Placid for the credit extended to Terrebonne, does not contain any provision that Placid should give five days written notice to Terrebonne before enforcing its security rights. In fact, Section 2.05 does not provide *1296 for Placid to give any notices to Terrebonne at all. Nor do the three separate security instruments provide for Placid to give Terrebonne five days written notice, or any other notice, prior to enforcing its security rights due to late payment by Terrebonne. Instead, Section 2.05 of the Fuel Agreement, after providing for the liens on Terrebonne's accounts receivable, bank account and inventory, states as follows:
SELLER (Placid) shall not take any action to execute on these liens for the payment of any invoice covering Product [diesel] delivered hereunder until after sixty-five (65) days from the date [of delivery].
Thus, under Section 2.05 of the Fuel Agreement, and the three security instruments, Placid could enforce its security rights, without prior notice, if Terrebonne did not pay for diesel by the sixty-fifth day after delivery. Terrebonne admits that, at the time Placid began to enforce its security rights, $298,599 was owed by Terrebonne to Placid for diesel delivered more than sixty-five days earlier, i.e. $298,599 was late.
Section 4.01 of the Fuel Agreement makes various provisions giving each party certain rights to terminate the agreement prior to expiration of its one-year term due to defaults of the other party. Among those various provisions is one, sub-Section 4.01(c), which is at issue here:
In the event BUYER [Terrebonne] fails to make payment on any invoice as it may become due, SELLER [Placid], at its sole option, may terminate this agreement if BUYER fails to cure the failure to pay within five (5) days of written notice by SELLER to BUYER. (emphasis added)
Thus, under sub-section 4.01(c), Placid must give Terrebonne written notice, and a five day opportunity to cure, prior to terminating the Fuel Agreement for Placid's failure to make timely payment. There is no mention in sub-Section 4.01(c) of Placid's security rights. Instead, sub-Section 4.01(c) deals solely with termination of the Fuel Agreement prior to its expiration.
Terrebonne advances two arguments that Placid was required to give Terrebonne five days written notice prior to Placid's enforcing its security rights. First, Terrebonne argues that, under the security instruments, a default must exist before Placid can enforce its security rights. Terrebonne then points out that Article IV of the Fuel Agreement is titled "Defaults and Remedies" and that sub-Section 4.01(c) is contained within Article IV. Evidently, Terrebonne is implying that, because sub-Section 4.01(c) with its five day written notice requirement for termination for late or non-payment is included within an Article titled "Defaults and Remedies", there must be a five day written notice prior to the exercise of any "remedy" for the default of late or non-payment. Terrebonne is stretching the language of the Fuel Agreement beyond reason. Article IV as a whole deals only with termination of the Fuel Agreement and, of course, sub-Section 4.01(c) deals only with termination for late or non-payment. Placid's security rights are dealt with in Article II, specifically Section 2.05, and are not even mentioned in Article IV. Lastly, as to this point, to the extent that this argument of Terrebonne is based upon the title of Article IV, it is unsound because Section 5.08 of the Fuel Agreement provides: "The titles of the Articles and Sections hereof are not a part of this Agreement, and shall not be deemed to affect the meaning or construction of any of its provisions."
Next, Terrebonne argues that Placid's beginning to enforce its security rights constituted a de facto "termination" of the Fuel Agreement. Apparently, what Terrebonne means by this is that, as a practical matter, once Placid began to enforce its security rights, Terrebonne could not continue in business without filing for Chapter XI bankruptcy reorganization to free up its bank account and accounts receivable from Placid. This argument is without merit. The five-day written notice requirement of sub-Section 4.01(c) clearly applies to an actual termination of the entire Fuel Agreement, including Placid's obligation to continue to sell and deliver up to 50,000 barrels of diesel per month, done pursuant to that sub-Section 4.01(c). Placid's security rights, and the restriction on their enforcement (i.e. enforcement only if there is late or nonafter sixty-five days), are dealt with in an entirely different portion of the Fuel Agreement. *1297 There is nothing in the Fuel Agreement which remotely purports to extend sub-Section 4.01(c)'s five day written notice requirement to the enforcement of Placid's security rights under any circumstances.
Terrebonne does not argue that the Fuel Agreement's provisions allowing Placid to enforce its security rights without prior notice to Terrebonne lead to "absurd consequences", La. Civil Code art. 2046, and no such absurd consequences are apparent. Placid was extending a great deal of credit, sometimes millions of dollars, to a small and newly-independent company for periods of time, sixty-five days from delivery, which all witnesses at trial agreed was much longer than the industry standard of about ten or eleven days. Further, it was undisputed at trial that Placid's only collateral consisted of non-permanent "liquid assets" (accounts receivable, cash in a bank account and diesel inventory) while all of Terrebonne's "fixed assets" (plant, equipment, etc.) were mortgaged to a bank and thus unavailable to Placid. It is unsurprising that the Fuel Agreement would give Placid the right to enforce its security rights immediately in the event of late or non-payment. No witness testified at trial that this right of Placid varied from the industry practice or was commercially unreasonable.
Terrebonne had its own internal comptroller and chief accountant, Mr. Talbot, who kept track of Terrebonne's accounts payable and so Terrebonne was aware of the amount and due date of its debts to Placid. Terrebonne's President, Mr. Songy, who was himself an accountant, had many years of experience in the industry and was familiar with the terms of the Fuel Agreement. There can be no doubt that Terrebonne was at all times aware of the possible consequences of late or non-payment.
There is no reason to construe the Fuel Agreement strictly against Placid and in favor of Terrebonne. "In case of doubt that cannot otherwise be resolved, a provision in a contract must be interpreted against the party who furnished its text." La. Civil Code art. 2056. As we see no ambiguity in the Fuel Agreement's provisions for Placid's security rights (Section 2.05) or in its provisions for termination for late or non-payment (sub-Section 4.01(c)), Article 2056's rule of interpretation is not implicated. Even if this rule of contract interpretation were implicated, there is no evidence as to which party, Placid or Terrebonne, "furnished the text" of Section 2.05 or sub-Section 4.01(c). The testimony of Mr. Theriot, who was Terrebonne's CPA and business advisor at the time the Fuel Agreement was prepared, and who was one of Terrebonne's expert witnesses at trial, shows that the text of the Fuel Agreement was negotiated through multiple drafts. In fact, Mr. Theriot, on behalf of Terrebonne, worked with an attorney in that drafting process.
Nor is there any evidence, or even any assertion by Terrebonne, that the terms of the Fuel Agreement resulted from any inequality in bargaining power. The testimony of Mr. Songy and others shows that the Fuel Agreement arose out of a larger, more complex transaction involving several parties in addition to Terrebonne and Placid and it appears that all parties were sophisticated and had substantial bargaining power.
Terrebonne argues that, even if the Fuel Agreement did not require that Placid give notice to Terrebonne prior to Placid's enforcing its security rights, a "course of dealing" between Placid and Terrebonne established such a notice requirement. The trial court, in its Reasons For Judgment, did not make any findings as to such a "course of dealing".
Terrebonne points out that Placid's assistant credit manager, Mr. Reynolds, began to keep track of which invoices to Terrebonne were not paid by sixty-five days after delivery, the interest accrued on those invoices, and credits due to Terrebonne because of early payment of some invoices. Apparently, Mr. Reynolds began to prepare periodic written reports of these figures and shared those reports with Terrebonne. Terrebonne argues that "Placid, through its own [assistant] credit manager, had supplanted the [Fuel] Agreement by the accounting for invoices due". In effect, Terrebonne argues that, because Placid was aware of and kept track of late payments for some months, and did *1298 not move to enforce its security rights for some months, Placid waived its contractual right to enforce its security rights without prior notice to Terrebonne.[1]
The record does not support Terrebonne's argument. During the first six or seven months of the twelve month term of the Fuel Agreement, there were only about two late payments and those were but a few days late. Beginning about the seventh or eighth month of the term of the Fuel Agreement, the payment situation began to change radically as Terrebonne began to be late on more and more invoices and the periods of lateness became longer and longer. Apparently, this resulted from a dramatic downturn in the oil and gas industry beginning during the seventh or eighth month of the term of the Fuel Agreement. In any event, Placid did not passively tolerate the late payments but, instead, almost immediately began to pressure Terrebonne about its debt to Placid. Beginning about the eighth month of the term of the Fuel Agreement and continuing right up to the enforcement of Placid's security rights just prior to the expiration of the Fuel Agreement at the end of the twelfth month, there were several meetings of Placid and Terrebonne to discuss the debt. Placid made apparent its displeasure with both the overall size of Terrebonne's debt and with Terrebonne's increasingly delinquent payments. In light of the short (five months or less) history of significant late payments, and Placid's objections to those late payments, it can hardly be said that Placid waived its contractual right to enforce its security rights due to non-payment simply because its assistant credit manager kept track of the late payments and shared his reports with Terrebonne. Moreover, Section 5.05 of the Fuel Agreement provides that no "change" or "waiver" of any provision of the Fuel Agreement is effective unless it is in a writing signed by Placid and Terrebonne. Cf. R.S. 10:1-205(4) ("course of dealing" cannot override express contractual provision).
Next, Terrebonne argues that Placid acted negligently, and committed a tort, by enforcing its lien rights against more collateral than was necessary to collect the delinquent $298,599. The trial court, in its Reasons For Judgment, made no findings as to this contention.
Placid caused Terrebonne's principal bank account to be frozen and sent notices to Terrebonne's account debtors to make payment directly to Placid. It is undisputed that the amount on deposit in the bank account (apparently, roughly $120,000) was far from adequate to pay the delinquent $298,599. Thus, it was certainly reasonable for Placid to enforce its security rights against Terrebonne's accounts receivable as well.[2]
Apparently, the total of the Terrebonne accounts receivable greatly exceeded the roughly $180,000 (the delinquent amount less the amount of the bank account) necessary to pay the delinquent debt. However, to the *1299 extent that the amount of the accounts receivable collected by Placid exceeded the amount of the delinquent debt, Placid would have been required to account to Terrebonne for the surplus. La. R.S. 10:9-502(2) and 10:9-504(2). Thus, Terrebonne would have received the proceeds of the accounts receivable less the deduction necessary to satisfy the delinquent debt. This result is not only in accordance with the statute, which contemplates that assignees of accounts receivable (like Placid) will enforce their rights against accounts receivable more in amount than the debt they secure, but is reasonable because the assignee of accounts receivable (such as Placid) will not know in advance which accounts receivable will prove to be collectable or how quickly each will be collected.
Also, in addition to the delinquent $298,599, Terrebonne owed Placid over $700,000 more which, while not yet due at the time the security rights were enforced, was all due in less than sixty-five days and a substantial portion of which was due much sooner. The total amount of Terrebonne's debt to Placid, and the total amount of Terrebonne's bank account and accounts receivable (assuming no bad debt allowance), were each somewhat over $1,000,000. Assuming that Terrebonne's accounts receivable would have been collected over the course of a month or two, and that Terrebonne's debt to Placid would all be coming due over that same period of time, it is apparent that Placid's enforcement of its security rights was not grossly disproportionate to the debt.
Because Placid would have had to account to Terrebonne for any surplus accounts receivable collected by Placid, because Placid's actions were within the contemplation of the statute, and because Placid's enforcement of its security rights was fairly proportionate to the debt, we do not believe Placid acted unreasonably under the circumstances. Certainly there was no tort by Placid.[3]
Although we have held that there is no liability of Placid to Terrebonne, we also will address the damages issue. That issue is not one of quantum of damages but, rather, whether Terrebonne was damaged at all by the lack of a five-day notice prior to Placid enforcing its security rights. Terrebonne's theory of damages is that, if it had received a five-day notice, it could have refinanced its debt with some third partyi.e. raised enough money to pay off the delinquent $298,599 within five days and to pay off the other more than $700,000 owed to Terrebonne as it became due over the following month or two. That way, Terrebonne argues, it could have avoided Chapter XI bankruptcy reorganization and the various adverse consequences of that process.
Terrebonne presented the testimony of two expert witnesses, Mr. Theriot and Mr. Neeble, in support of its contention that its debt could have been refinanced in five days. However, the trial court, in its Reasons For Judgment, expressly rejected the testimony of those two expert witnesses as "unduly optimistic". The trial court, in its Reasons For Judgment, found that it would be "simply unrealistic" to conclude that Terrebonne could have refinanced its debt in five days. The trial court's Reasons For Judgment allude to the fact that Terrebonne had been looking for new financing for about four months with no success. In fact, Terrebonne had fruitlessly contacted thirty or more lenders including virtually every bank in New Orleans. The damages argument of Terrebonne's brief, like the testimony of its expert witnesses at trial, focuses to a great extent on the contention that Terrebonne could have "factored" its accounts receivablei.e. sold them to a third party at a substantial discount from their face valuebut this contention runs up against the obstacles that Placid had a first lien on all the accounts receivable, that the debt owed to Placid (over $1,000,000) was close to the face value (no bad debt allowance) of all the collateral, and that a *1300 bank to which Terrebonne owed a multimillion dollar debt had a second lien on the accounts receivable. Considering the record as a whole, the trial court had ample reason to find that Terrebonne would not have been able to refinance in five days, and that finding is certainly not clearly wrong or manifestly erroneous. See Stobart v. State, DOTD, 617 So.2d 880, 882-83 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989).
However, despite its factual finding that Terrebonne would not have been able to refinance in five days, i.e. despite its rejection of Terrebonne's damages theory, the trial court awarded Terrebonne damages of $500,000:
Nonetheless, Placid's precipitous exercise of its security devices deprived Terrebonne of the opportunity to attempt survival. This opportunity had value. The question is how much was this opportunity worth. At this point two contradictory rules of law compete for application. The first says plaintiffs must prove their damages, and such proof must not be speculative. The second rule says that where damage has occurred, a plaintiff must not be penalized because he can not prove with any precision, the extent of the damage. I think under the circumstances of this case, the second rule should be applied. The damage suffered in this case, i.e., the loss of the opportunity to seek a lender, is estimated to be $500,000.00.
Apparently, the "second rule" referred to is Civil Code Article 1999 which provides: "When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of damages". (emphasis added). Article 1999 obviously contemplates proof that there has been some damage, i.e. that damage has actually occurred, before there is discretion to assess the amount of damages. This is made even clearer by Civil Code Article 1994 which provides: "An obligor is liable for damages caused by his failure to perform a conventional obligation". (emphasis added). If the obligor's failure did not cause any damages, there is no liability.
Here, Terrebonne's only claim as to how the lack of five-days notice caused Terrebonne any damage is the claim that, in five days, Terrebonne could have refinanced. But, the trial court expressly found as a matter of fact that Terrebonne could not have refinanced in five days, so it cannot be said that the lack of five days notice caused Terrebonne to lose the opportunity to refinance. As the lack of five days notice did not cause any damage, no amount of damages can be awarded.
Placid's reconventional demand is based upon alleged misrepresentations by Terrebonne as to the amount of collateral. The Fuel Agreement limited the amount of credit that would be extended to Terrebonne at any one time to the total of the collateral (cash, accounts receivable and inventory, subject to certain percentage limitations and conditions). Pursuant to the Fuel Agreement, Terrebonne made periodic written reports to Placid as to the amount of collateral.
Terrebonne also was indebted to a bank and, as a result, sent periodic financial statements to that bank. There were variances between those financial statements sent to the bank, and the periodic reports as to collateral sent to Placid, with regard to the amount of cash that Terrebonne had at various times. In particular, the financial statements sent to the bank showed Terrebonne having less cash than was being reported to Placid. Consequently, Placid alleges that Terrebonne was overstating the amount of collateral in its reports to Placid.
The testimony presented at trial by Terrebonne was to the effect that Terrebonne would write (or its computer would print) a large number of checks at one time for the payment of Terrebonne's accounts payable. Some of those checks would be put, unsigned, into a drawer and would not actually be mailed until ten days or more later. However, in the financial statements sent to the bank, the amount of Terrebonne's cash immediately would be reduced by the amount of checks written or printed even though those checks were not to be mailed for some time. In contrast, in the reports to Placid, the amount of Terrebonne's cash was not reduced by checks which had been written or *1301 printed but which were not to be mailed for some time.
The trial court, in its Reasons For Judgment, accepted as credible the above-described testimony. The trial court found that the financial statements sent to the bank were in error and that the reports sent to Placid were accurate. In any event, in light of the testimony accepted as credible by the trial court, the variances between the financial statements to the bank and the reports to Placid were satisfactorily explained, and the reports to Placid were not misleading. Placid presented accounting testimony to attempt to rebut Terrebonne's explanation, but the Placid accounting testimony was shown on cross-examination to be based upon some assumptions and conjecture, and the trial court reasonably could choose to credit the testimony presented by Terrebonne over that presented by Placid.
The trial court's determinations of credibility and findings of fact will not be disturbed on appeal so long as they are reasonable in light of the record as a whole. Stobart, supra; Rosell, supra. The trial court's finding that there was no misrepresentation by Terrebonne is reasonable.
For the foregoing reasons, we reverse the judgment of the trial court on the principal demand (Terrebonne v. Placid) and render judgment dismissing Terrebonne's claims against Placid. We affirm the judgment of the trial court as to Placid's reconventional demand.
REVERSED IN PART; AFFIRMED IN PART; RENDERED.
BARRY, J., concurs with reasons.
BARRY, Judge, concurring with reasons.
The majority correctly notes that security instruments referenced in Section 2.05 of the Diesel Fuel Purchase and Credit Agreement do not require written notice and five days to cure the failure to pay. However, at least one assignment provides: "In the event of default...." Default is not defined or explained in the instrument. It is necessary to look to the Fuel Purchase Agreement to determine what constitutes a default.
Section 2.02 provides that payment is due 65 days after the date of title transfer. According to Section 1.05, title and risk of loss and liability for the delivered product passes to Terrebonne when the product passes through the flange connecting Placid's refinery with Terrebonne's tank truck, boat or barge.
Therefore, Terrebonne was constructively in default when it did not pay on the 65th day after delivery, and Placid had authority to execute based on the assignments. Under Section 2.05 Placid could not take action to execute on the liens until 65 days from the date that title transferred upon delivery. After that Placid was within its authority to act upon the assignments.
NOTES
[1] The statute cited by Terrebonne as establishing "course of dealing" as a legal concept, La. R.S. 10:1-205(1), does not have any literal application to the present issue. That statute defines "course of dealing" as "a sequence of previous conduct between the parties to a transaction" (emphasis added) whereas, as to the present issue, Terrebonne relies upon conduct after the signing of and during the term of the Fuel Agreement. "Course of dealing under [1-205] Subsection (1) is restricted, literally, to a sequence of conduct between the parties previous to the agreement." UCC Official Comment 2 to 1-205. Nevertheless, we understand the substance of Terrebonne's argument as being based upon the course of performance of the Fuel Agreement during its term, and we will address it on that basis.
[2] Section 202(b) of the Fuel Agreement provides that credit purchases of diesel from Terrebonne by Placid Oil Company will be offset against Terrebonne's debt to Placid. Terrebonne's brief states that, shortly after Placid began to enforce its security rights, Placid Oil Company sent its vessels to Terrebonne's fuel docks to draw diesel. Presumably, Terrebonne is implying that this was a sort of "seizure" of the diesel inventory over which Placid had a lien. The record shows that, at about the time of Placid's enforcement of its security rights, Placid Oil Company vessels purchased diesel from Terrebonne. Even assuming that these were credit (not cash) purchases, these purchases would have created offsets that reduced Terrebonne's debt to Placid, so they certainly did no harm to Terrebonne. In any case, the parties obviously contemplated that Placid Oil Company would purchase diesel on credit from Terrebonne, because the Fuel Agreement provides for offsets from such credit purchases, so Placid Oil Company's credit purchases of diesel certainly did not violate the Fuel Agreement.
[3] Terrebonne claimed at trial, and mentions in its brief, that Placid "curtailed" deliveries of diesel to Terrebonne. Under the Fuel Agreement Section 1.03, Placid was obligated to sell and deliver to Terrebonne no more than 50,000 barrels of diesel per month. Terrebonne does not argue on appeal that Placid failed to sell and deliver at least 50,000 barrels of diesel per month. In any case, there was no testimony or other evidence at trial that Terrebonne failed to sell and deliver at least 50,000 barrels per month.