703 So.2d 709 (1997)
Patrick A. DELANEY
v.
WHITNEY NATIONAL BANK.
Nos. 96-CA-2144, 97-CA-0254.
Court of Appeal of Louisiana, Fourth Circuit.
November 12, 1997.
Opinion Denying Rehearing December 15, 1997.
*712 Nesser, King & LeBlanc, Patricia A. Krebs, J. Grant Coleman, Timothy S. Madden, New Orleans, for Plaintiff-Appellant Patrick A. Delaney.
Phelps Dunbar, Harry Rosenberg, M. Nan Alessandra, Jane E. Armstrong, New Orleans, for Defendant-Appellant Whitney National Bank.
Before SCHOTT, C.J., and KLEES, ARMSTRONG, WALTZER and MURRAY, JJ.
*713 KLEES, Judge.
Defendant Whitney National Bank appeals the judgment of the civil district court, finding it responsible for larger payments from its retirement plan to Plaintiff Patrick Delaney. Delaney also appeals from that judgment in respect to certain damages he was denied. Upon our review of the record, we reverse in part and affirm.
Plaintiff Patrick Delaney (Delaney) sued Whitney National Bank (Whitney) in the civil district court, claiming that Whitney had failed to pay the full benefits to which Delaney was entitled under his nonqualified retirement plan and an agreement between the two parties entered into upon the cessation of Delaney's employment there. The nature of this agreement, and the circumstances of its formation, are a matter of some dispute.
By 1989, after almost 36 years with the bank, Delaney had risen from trainee clerk to Chief Executive Officer. He was earning $500,000.00 per annum, and had no intention of leaving Whitney at any point in the near future. Apparently there were those in the organization who felt differently; Delaney was forced to retire, on rather short notice, on October 31, 1989.
On November 1, 1989, Delaney and Whitney entered into the agreement in question. This agreement not only described Delaney's departure as "retirement" but provided for a considerable package of benefits in connection with that retirement. Delaney was to receive: (1) salary for the remainder of 1989; (2) employee benefits, including full benefits under Whitney's qualified retirement plan and excess retirement plan; and (3) the sum of $1,187,497.00. The nature of the $1.187 million payment is not explicitly stated within the agreement itself.
The retirement plans referred to in the agreement were arrangements sponsored and administered by Whitney; the two pertinent to this litigation are the qualified retirement plan (Retirement Plan) and a non-qualified retirement plan (Excess Plan.) The Retirement Plan was a qualified employee benefit plan of the type subject to the provisions of the federal Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001. The Excess Plan was designed to cushion primary retirement benefits against alterations and amendments made to the Retirement Plan or the law over time, specifically to reductions activated by Internal Revenue Code § 415, a provision dealing with the treatment of high-income retirement plans, and "any successor provisions thereto."
One change in the law regarding retirement benefits had taken place after the adoption of the Excess Plan but before Delaney's retirement. In January of 1989, Internal Revenue Code § 401(a)(17) became active in regard to the Retirement Plan. Under § 401(a)(17), compensation taken into account for retirement benefit accrual purposes is capped at $200,000.00. Apparently, during the negotiations surrounding the arrangement, neither party brought up the effect that this new tax code might have on Delaney's future benefits.
In October of 1992, Delaney was informed that he could choose to receive his retirement benefits early; he asked for information on how such a choice would affect those benefits. Whitney took some time in answering Delaney's inquiries; the complexity of the plans themselves and the effect of new amendments and this new tax code appear to have caused some confusion. Whitney initially provided conflicting information as to the amounts Delaney would be receiving from the plan, and at one point retracted the invitation to receive early retirement benefits, telling Delaney that he was no longer eligible for this. Finally, Delaney was allowed to begin receiving those early benefits, albeit with payments lower than he had initially been told. Apparently § 401(a)(17) had diminished the amount of money to which Delaney was entitled under the Retirement Plan, and the Excess Plan did not fully compensate for this. Displeased with the lower amounts, and the manner in which these affairs had been handled by Whitney, Delaney brought suit, seeking damages for breach of the agreement.
Delaney brought suit in district court seeking damages for breach of contract. Whitney twice attempted to remove this case to the United States District Court for the *714 Eastern District of Louisiana, feeling that the case involved federal questions arising under ERISA, but the case was remanded on both occasions. Following extensive and hotly contested pretrial motions, a jury trial was held; the jury found that Whitney had breached the agreement with Delaney, that Delaney's $1.187 million was to be considered "compensation" for the purposes of determining the benefits he was due under the two retirement plans, that Delaney should be receiving $6993.00 per month from the Excess Plan, and that Whitney intentionally and in bad faith breached the agreement. The trial judge overturned the finding of bad faith, rendering a JNOV in Whitney's favor on that issue, and otherwise adopted the jury's findings as his own judgment. From that judgment Whitney and Delaney both appeal.

DEFENDANT'S ASSIGNMENTS OF ERROR
Whitney first asserts that the trial court erred in overruling the peremptory exception of no cause of action. As defendant is a national banking association, it is governed by the provisions of 12 U.S.C. § 24in particular, the provision granting such a banking association the sole power to choose and dismiss its officers. Whitney points out that this provision is generally interpreted to give such banks the statutory right to dismiss officers at will, and argues that it should be construed to preclude any breach of contract claim arising from the termination or dismissal of an officer of a national bank. See City National Bank of Baton Rouge v. Brown, 599 So.2d 787 (La. App. 1 Cir.1992).
We find this interpretation of the statute to be clear and accurate, yet inapplicable to the present case. Delaney's suit does not in any way protest the cessation of his employment at Whitney. His claim lies entirely in the enforcement of the agreement entered into upon his resignation. The federal statute cited by Whitney does not provide any shelter from such a claim. As such, we find no merit in this argument.
In its next assignment of error, Whitney argues that the trial court erred in failing to adequately instruct the jury to consider whether or not the Agreement was a settlement between Delaney and Whitney. The bank wanted the jury to consider this issue carefully, as the characterization of the $1.187 million could well depend on this point. Whitney submitted a jury instruction on the issue which the trial court refused to give, using instead a much more abbreviated instruction which Whitney finds inadequate. Since the jury was not sufficiently informed about this key issue, the bank believes their determination that the $1.187 million payment was "compensation" for the purposes of the Retirement Plan should be considered suspect, and that the jury verdict should be set aside to correct this error.
When considering jury instructions the determination of reversible error is made by asking whether the jury was misled to such an extent as to prevent it from doing justice. Dye v. Schwegmann Giant Super Markets, 599 So.2d 412 (La.App. 4 Cir.1992.) Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. The adequacy of any jury instruction given by a trial court must be determined in the light of jury instructions as a whole. Id.
The jury's finding in this area is at discord with the facts presented; it is probable that more comprehensive instructions would have been helpful. However, based on the record before us, we cannot say that the jury instructions were so incorrect or inadequate as to prevent the jury from reaching a verdict based on the law and the facts, and thus do not constitute manifest error. The instructions taken as a whole were adequate to inform the jury of the questions presented for their consideration. Id. We therefore decline to invalidate the entire verdict on this one issue, which will be discussed in greater detail separately.
Whitney further argues, in its next assignment of error, that the trial court erred in denying Whitney's Declinatory Exceptions of Lack of Subject Matter Jurisdiction and Peremptory Exceptions of No Cause of Action. The bank believes the trial court to have been in error in allowing Delaney's *715 breach of contract claim when it should have been preempted by the Employee Retirement Income Security Act ("ERISA.") The Employee Retirement Income Security Act of 1974 gives federal courts jurisdiction over disputes regarding the administration of plans described within ERISA. The bank's qualified Retirement plan is among those under the aegis of ERISA
State laws that relate to an ERISA plan are preempted; ERISA's jurisdiction is exclusive. New Orleans Sheet Metal Worker's v. ABC Ins., 599 So.2d 868 (La.App. 4 Cir.1992.) Since several points of Delaney's allegations did touch upon the administration and construction of the Retirement Plan, Whitney argues that the trial court had no jurisdiction over the present case.
However, ERISA does not supersede state law absolutely; certain specific areas are exempted. Those exemptions are described in 29 U.S.C.A. § 1003(b). One such area that has been specifically reserved for state control is the management of "unfunded excess benefit plans"such as Whitney's Excess Plan. Delaney asserts that the administration of Whitney's Excess Plan lies at the root of his cause of action, and it is true that the majority of the issues in dispute focused on the Excess Plan. While some information about the Retirement Plan was brought into evidence in an effort to prove various assertions about Whitney's intent and the basis for the agreement between the parties, Delaney does not challenge the administration of the Retirement Plan itself. We agree with the trial court that this case falls in the specific exemption to ERISA jurisdiction found in 29 U.S.C.A. § 1003(b)(5); therefore, the trial court did have jurisdiction over this case and Whitney's Declinatory Exceptions of Lack of Subject Matter Jurisdiction and Peremptory Exceptions of No Cause of Action were properly denied. This assignment of error is without merit.
In its next assignment of error, Whitney argues that the trial court erred in allowing parol evidence concerning the excess plan and in admitting testimony regarding amendments to the Retirement Plan after Delaney had left the bank.
Parol evidence is only properly admitted in regard to a document when that document is ambiguous on its face. Kean v. Lemaire, 451 So.2d 151, 153. (La.App. 1 Cir.1984.) Such evidence was admitted in the present case in regard to the terms and intent of the Excess plan and Whitney's failure to notify Delaney of the amendments. Whitney alleges that such admission was improper on the grounds that the Excess Plan is clear and unambiguous on its face.
We find it curious that Whitney is defending the Excess Plan as clear and unambiguous when its own accountants were unable to provide consistent interpretations of its effects for Delaney. It appears from the record that the bank itself had difficulty determining the precise effect that the various changes in the plans and the law would have on Delaney's benefits; the actuarial firm that had served Whitney for years was obliged to provide several different calculations before settling upon the one Whitney finally began applying to Delaney. Furthermore, the Excess Plan states that it will compensate for reductions triggered by § 415 or "any successor provisions thereto." The term "successor provisions" is not defined within the plan: it could refer only to amendments to § 415 itself, or it could refer to other tax code amendments dealing with the limits on high-income retirement benefitsamendments like § 401(a)(17).
If the terms of a written contract have more than one interpretation or when uncertainty and ambiguity exist as to the provisions of a written agreement, parol evidence is admissible to clarify the ambiguity or to ascertain the intent of the parties. La. Civ. Code art. 1848. As this appears to be true in the present case, we cannot say that the court erred in allowing parol evidence to clear up some of the considerable confusion surrounding this document.
Whitney also argues that Delaney's evidence touched upon the administration of the Retirement Plan, an area governed by ERISA and inappropriate for this forum. Delaney counters this argument by pointing out that he was not, in fact, challenging the administration of the Retirement Plan. He alleged inappropriate administration of the *716 Excess Plan, a plan not preempted by ERISA, breach of the retirement agreement, and bad faith on the part of Whitney. Delaney introduced this evidence in an attempt to prove these allegations, and the trial court correctly admitted it for this purpose. Evidence inadmissible for one purpose may be admissible for another. State v. Nash, 475 So.2d 752 (La.1985.) We believe the trial court properly admitted the evidence to establish Whitney's breach of the agreement.
In the next assignment of error, the bank argues that the trial court erred in denying Whitney's motion for summary judgment, both in general and particularly concerning the applicability of § 401(a)(17) to the determination of Delaney's benefits. Summary judgment was granted in Whitney's favor only on the question of nonpecuniary damages. Whitney feels that there were no genuine issues of material fact in dispute, and thus the trial court was in error.
Whitney condenses Delaney's allegations about the shortfall from the Excess Plan into three issues: (1) whether Code § 401(a)(17) applied to the computation of Delaney's benefits; (2) whether Delaney was to be compensated for any limits put on his benefits by § 401(a)(17); and (3) whether the $1.187 million should be treated as a settlement or as compensation.
Ultimately, § 401(a)(17) was found applicable by the trial court as a matter of law; therefore, summary judgment would have been appropriate earlier in the proceedings. However, this does not constitute reversible error.
Whitney relies upon several formulas and calculations to support its allegations about the next two issues; however, it is quite clear that the operation of the retirement plans, the reasons behind the amendments to the plans, and the nature of the $1.187 million were all contested and complex issues, inappropriate for resolution at the summary judgment level. Whitney's oversimplification of the issues in brief cannot overcome the weight of substantial evidence on both sides of the conflict. The trial court was entirely correct in refusing summary judgment and conducting a more thorough examination of the issues in dispute.
Whitney next argues, in another assignment of error, that the trial court erred in denying Whitney's Motion in Limine seeking to exclude testimony and evidence relating to the administration of the Retirement plan. The bank insists that any evidence regarding the administration of the Retirement plan is completely preempted by ERISA. In its motion, Whitney relied upon ERISA's broad preemption clause, set out in 29 U.S.C. § 1144(a): this clause provides for the exclusive jurisdiction provisions of ERISA, 29 U.S.C. § 1132(e), and the ERISA preemption defense. Whitney points out that ERISA's preemption provisions provide a complete defense to state law claims. See New Orleans Sheet Metal Worker's, supra. The bank argues that these provisions support the motion in limine, requiring the exclusion of testimony and evidence regarding the Retirement plan.
ERISA does govern the administration of funds such as Whitney's Retirement Plan. ERISA does not, however, block all information about any plan governed by ERISA from being introduced in a trial on any other grounds. Delaney's suit, as previously discussed, was rooted in the application of the Excess Plan; testimony about the Retirement Plan was admitted not for the purposes of attacking the Retirement Plan's administration, but to explain how the Excess Plan operated in regard to the Retirement Plan. Therefore, the evidence was properly admitted and Whitney's Motion in Limine was correctly denied.
In the next assignment of error, Whitney argues that the trial court erred in denying Whitney's motion for directed verdict on the issue of bad faith. In the present case, the trial judge had already made it clear to counsel that he felt that there was no bad faith on Whitney's part. He denied the motion for directed verdict and allowed the charge to go to the jury, which returned a verdict finding that Whitney had acted in bad faith. The trial judge then granted Whitney's Motion for Judgment Notwithstanding the Verdict on this issue, overturning that finding of bad faith.
*717 Although the trial judge has reversed the adverse decision by the jury on this issue, Whitney argues that the submission of this issue to the jury is, in itself, reversible error. The bank considers the jury instruction and interrogatory on this sensitive, even inflammatory issue, to be prejudicial; if the jury was allowed to consider bad faith, Whitney argues, then this in itself colored the deliberative process and tainted the jury's decisions on all the issues at trial, not merely the one at hand. The bank concludes that the jury's verdict should be set aside as a result.
A trial judge has much discretion in determining whether or not to grant a motion for a directed verdict. Barnes v. Thames, 578 So.2d 1155, 1162 (La.App. 1 Cir.1991.) A motion for directed verdict is properly granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. Id. As the trial judge in this case went on to grant JNOV in Whitney's favor on this issue, granting this directed verdict would have been proper. However, we cannot say that a refusal to grant the directed verdict constitutes reversible error. The trial judge overturned this jury finding, and thus kept Whitney from being held liable for damages for bad faith. The jury was allowed to examine this question, but this in and of itself should not be so corrosive to the deliberative process as to undermine the entire result. Although the issue of bad faith might cast some doubt upon Whitney's assertions at trial, it does not appear to have been so grossly prejudicial as to warrant an entirely new trial. We therefore decline to dispose of the all the jury's findings in this complex case because of the consideration of one issue.
Delaney contests the reversal of the jury's verdict in this regard; we will discuss his assignment of error separately.
In Whitney's final assignment of error, the bank argues that the trial court erred in denying Whitney's motions for JNOV or a new trial. After the jury rendered its verdict, the bank made these motions, which the trial court granted as to the jury's finding of bad faith but denied in all other regards.
A refusal to render a JNOV can only be overturned if it is manifestly erroneous. Plummer v. Marriott Corp., 94-2025 (La.App. 4 Cir. 4/26/95), 654 So.2d 843, 846. A denial of a motion for a new trial will be reversed only if there has been an abuse of discretion. Belle Pass Terminal v. Jolin, Inc., 92-1544 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, 493.
Whitney's defense of these motions consists, basically, of a reiteration of the case presented at trial; the bank argues again that the claim should have been blocked by ERISA, that Whitney did not in any way breach the agreement with Delaney, and that Delaney had already received the full measure of his retirement benefits. As we have reviewed each of these findings and found only minimal and harmless error, we cannot say that the verdict as finally rendered was clearly contrary to the law and the evidence. Therefore, Whitney's motions for JNOV or a new trial were properly denied.

PLAINTIFF'S ASSIGNMENTS OF ERROR
Delaney asserts that the trial court erred in refusing to increase the monthly damage award to account for inclusion of the original $1,187,497.00 payment made by Whitney to Delaneyie, to consider it as part of his salary for purposes of determining his retirement benefits. The jury did specifically find that the $1.187 million was to be considered compensationyet Delaney was awarded $6993.03 per month from the plan, an amount which suggests his damages were calculated without taking the $1.187 million into account. Apparently, the jury calculated his damages without counting the $1.187 million as compensation for the purposes of determining his benefits. According to Delaney's calculations, if the $1.187 million is counted in as compensation under the retirement plan, he should be receiving $9,376.30 per month. He therefore considers the jury's findings incompatible, and urges this court to amend the amount of his award to *718 reflect the status of the $1.187 million as compensation.
Whitney agrees that the jury's findings in this matter are incompatible, but counters his argument by asserting that the jury's findings are incorrect as to the status of the 1.187 million, not in the amount finally bestowed upon Delaney. Whitney continues to argue that the money was given to Delaney as part of a settlementa relinquishment of all claims against Whitney arising from the abrupt end of his employment there. The agreement between the bank and Delaney is absent of any language that would require Delaney to relinquish any claims; however, this court is not inclined to see this 1.187 million, paid after the last day of Delaney's already well-rewarded employment, as compensation for work done. This court therefore reverses the jury's finding that this money constituted compensation; the lower sum of money granted to Delaney, $6993.03 per month, is appropriate for the actual salary and compensation he earned while employed by Whitney, and that amount will stand.
In his next assignment of error, Delaney argues that the trial court erred in overturning the jury's finding that Whitney intentionally and in bad faith breached the Agreement. The jury reached this conclusion after the presentation of all evidence and due deliberation; a district court's authority to overrule a jury's findings and grant a JNOV is limited to situations in which the facts point so strongly in favor of a party that the court feels a reasonable jury could not arrive at a contrary verdict. See Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991).
Where two permissible views of the evidence exist, the fact-finder's choice between them cannot be manifestly erroneous. Schlesinger v. Herzog, 95-1127 (La. App. 4 Cir. 4/3/96), 672 So.2d 701. Therefore, a jury's verdict should not be set aside as long as a fair interpretation of the evidence supports it. See Willis v. Louisiana Power and Light, 524 So.2d 42 (La.App. 4 Cir.1988.) All reasonable inferences from the evidence are to be construed in the light most favorable to the non-moving party. Egan v. Hullinghorst Indust., Inc., 537 So.2d 1226 (La.App. 4 Cir.1989.)
Delaney did assert at trial that Whitney acted deliberately to deny him, and only him, full retirement benefits. He did offer proof that he received contradictory information from Whitney at various times; Delaney therefore concludes that bad faith is a permissible inference from the evidence presented, and so this jury finding should not have been overturned.
Whitney defends the trial court's action by pointing out that the trial court had already opined, before any jury consideration, that Delaney had shown no proof of bad faith. Delaney made various allegations; however, what he introduced into evidence did not reach the burden of proof of bad faith. A breach of the agreement, in itself, is insufficient. In order to determine bad faith, we must ask whether the party acted "intentionally and maliciously." La. C.Code art.1997, comment (b).
Bad faith generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties. See Adams v. First Nat'l Bank of Commerce, 93-2346 (La. App. 4 Cir. 9/29/94), 644 So.2d 219, writ denied, 94-3053 (La.2/3/95), 649 So.2d 411.
The evidence submitted at trial does not lend itself to an inference of such deliberate malice. Disagreement and confusion have ruled the interaction between Delaney and Whitney since Delaney's resignation, but Delaney has not offered up evidence of fraud. Therefore, the trial court was correct to grant Whitney's JNOV overturning the jury finding of bad faith.
In his next two assignments of error, Delaney asserts that the trial court erred in failing to award him nonpecuniary and unforeseeable damages for Whitney's breach. Whitney was granted summary judgment on the issue of nonpecuniary damages, and Delaney attacks this judgment; he refers to the deleterious effects of this conflict on his health and well-being, and asserts that these problems entitle him to an award of such damages.
*719 However, article 1998 of the Louisiana Civil Code denies Delaney such relief. It states that nonpecuniary damages are recoverable only if the contract is, in its nature, intended to gratify a nonpecuniary interest and a breach would clearly cause such damages, or where the obligor's breach was specifically intended to aggrieve the feelings of the obligee. Nonpecuniary damages should not, as a rule, be awarded for breach of a pecuniary contract, and Louisiana courts have generally adhered to this principle. See Young v. Ford Motor Company, 595 So.2d 1123 (La.1992.) We see no compelling reason to divert from that rule here; the agreement between Delaney and Whitney is clearly pecuniary in nature, and Delaney has failed to prove that Whitney has any specific intent to cause him emotional harm. Delaney insists that an underlying element of the contract in question is nonpecuniary; he was apparently unnerved by the sudden insistence on his resignation, and bargained for not only the money involved but also his security and peace of mind. However, these concerns are shared by virtually anyone negotiating retirement benefits; it could even be said that every person signs a contract with some hope of security. We would require more compelling circumstances than these to find nonpecuniary interests to such a degree as would overcome the rule. The trial court correctly denied these damages.
As for the question of unforeseen damages, Whitney points out that Delaney has failed to preserve this issue for appellate review. Delaney did not propose a jury instruction on this and did not object to the trial court's omission of such an instruction. A party may not assign error to the failure to present a jury instruction unless an objection is made. La. C.C.P. art. 1793(C). See Cazenave v. Pierce, 568 So.2d 1360 (La.App. 4 Cir.1990), writ denied, 572 So.2d 68 (La.1991.)
Delaney protests that he did, in fact, object to the lack of such an instruction. It appears, however, that the objection Delaney made was over the omission of certain jury instructions for damages for bad faithnot over the failure to instruct the jury on unforeseeable damages. Therefore, this issue has not been preserved for appellate review.
In the next assignment of error, Delaney says the trial court erred in failing to award him attorney's fees. He first argues from the position that the jury did find bad faith, and attorney's fees are awarded to a plaintiff who has proved an intentional, bad-faith breach of a contractual obligation. La. Civ. Code art. 1997, Cobb v. Gallet, 392 So.2d 134, (La.App. 1 Cir.1980.) Since we have already determined that the trial court correctly overturned the jury finding of bad faith, this argument need not be discussed further.
Delaney next points out that attorney's fees have been awarded in past in compensation for violations of the Louisiana Wage Payment Act, La. R.S. 23:631. A refusal to pay retirement compensation has been a factor in several decisions finding violations of the Wage Payment Act. See Thomas v. Orleans Private Industry Council, Inc., 95-1577 (La.App. 4 Cir. 2/15/96), 669 So.2d 1275. Delaney would have this court consider this case as one that lies in violation of the Wage Payment Act, and award attorney's fees accordingly.
However, this court agrees with Whitney's counterargument, namely that "wages," under the meaning of the Wage Payment Act, should be more narrowly construed to apply only to compensation earned during a pay period. These retirement benefits are not within that category. See Boudreaux v. Hamilton Medical Group, Inc., 94-0879 (La.10/17/94), 644 So.2d 619. The cases that Delaney attempts to rely on all actually award such fees for violations that do involve wagesthe retirement benefit problems are invariably incidental. We therefore decline to recharacterize Delaney's case at this point in the proceedings, and uphold the trial court's denial of attorney's fees.
In his final assignment of error, Delaney argues that the trial court erred in failing to assess judicial interest from the first day the lower retirement benefits were paid to Delaney. The trial court provided that interest on the unpaid benefitsa sum of $41,958.18should commence on the day of judicial demand. Delaney asserts that, since *720 Whitney has delayed the performance of a contractual obligation, damages could be said to run from the date that Whitney failed to perform.
In Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978), the Supreme Court concluded that claims arising from a contract bear judicial interest from the date of judicial demand or from such earlier date when the claim became ascertainable and due. Delaney argues that his claim is ascertainable from the date that Whitney began the low payments of retirement benefitsJuly 1, 1994.
However, from the record before us, it appears that Whitney never failed to pay benefits to Delaney and was at no time in default. The two parties disagreed as to the appropriate performance for Whitney, but Whitney never failed to perform under the contract as the bank then understood it. The precise amount of the claim at stake was not ascertainable until the court determined what was the most proper payment. See River Road Constr., Inc. v. Canal Indemnity Co., 538 So.2d 625 (La.App. 1 Cir.1988.) The trial court was therefore correct to assign interest from the date of judicial demand.
Consolidated with this case are appeals by Delaney and Whitney contesting the costs awarded Delaney by the trial court. Delaney estimates his expenses compensable by law at $58,173.90; the trial court, taking a somewhat more restrained view of which court costs should be recoverable, awarded him $5,866.76. Delaney urges this court to overturn the trial judge's ruling. Whitney, alternately, argues that Delaney has recovered even more in costs than he should have.
In Delaney's original Motion to Fix and Tax Costs, he sought fees paid to the clerks of court totaling $1,971.96, to the sheriff totaling $1,084.80, and to court reporters totaling $342.00. Delaney also wanted compensation for costs relating to depositions, for professional services from experts at trial, and for photocopies and exhibits.
The assessment of costs lies within the trial court's discretion, and that assessment of costs is to be reversed only if the trial court abuses that discretion. See Jacobs v. Loeffelholz, 94-1123 (La.App. 4 Cir. 12/15/94), 647 So.2d 1282, 1287. La. C.C.P. Art.1920 grants the trial court broad discretion to assess whatever costs the court considers equitable.
In the present case, Whitney took strong exception to some of Delaney's proposed costs; they argued that Delaney's accounting included documents and exhibits not introduced in evidence, expert witness fees for witnesses who were not experts, and multiple copies of documents. The trial court agreed with Whitney's reasoning in this matter, and assessed the following costs: Clerk of Court fees$1,971.96. Sheriff fees $1,084.80. Depositions$2,692.00. Photocopies$118.00.
Giving reasons for his lower assessment of costs, the trial court noted, "Individuals who are hired by a party and prepare for trial who either do not qualify as expert witnesses or although may be professional but testify as to facts are not entitled to fees for their time."
"Depositions not formally introduced in evidence are not properly taxed as costs."
"Exhibits used in court to assist the jury but not introduced in evidence are not properly taxed as costs. No one can be sure such exhibits helped the jury."
"No law requires multiple copies of documents to assist the court or triers of fact. Such are not properly taxed for they fall in the venue of trial strategy of counsel."
The only costs taxable against a litigant are those provided for by positive law. Succession of Franz, 242 La. 875, 139 So.2d 216, 218 (1962.) The positive law governing this situation is La. R.S. 13:4533, which defines "cost" as "the cost of the clerk, sheriff, witness fees, costs of taking depositions, and copies of acts used on the trial, and all other costs allowed by the court"
This brings us to Whitney's contention that Delaney was actually granted more in costs than he was actually entitled to. Whitney argues first that the trial court overestimated Delaney's costs for deposition transcripts; we find this assertion unpersuasive, given the complexity of the case and the *721 conservative amount awarded by the trial court. Whitney then claims that the clerks of court fees were improperly awarded, since Delaney offered up no independent proof of the actual sums. Whitney does not argue that such fees are not recoverablethey are expressly granted by statuteor that Delaney has exaggerated those fees. The trial court accepted Delaney's estimate of the fees without requiring independent verifying proof, and we find no reversible error in that decision. Whitney's assertions of error are therefore without merit.
From our review of the record it appears that the trial court granted Delaney those costs required by La. R.S. 13:4533, and exercised reasonable discretion in gauging which costs were so required. His reasoning behind this assessment is explicit and clear, and this court agrees with that reasoning. The trial court did not abuse its discretion in awarding costs, and that judgment is therefore affirmed.
Based on our review of the record, and for the reasons set forth, we reverse the finding of the trial court characterizing the $1.187 million payment as "compensation;" in all other respects, we affirm. In addition, the award of court costs by the trial court is affirmed.
REVERSED IN PART AND AFFIRMED IN PART
SCHOTT, C.J., concurs in part and dissents in part.
MURRAY, J., concurs in part and dissents in part for the reasons assigned by SCHOTT, C.J.
ARMSTRONG, J., dissents.
SCHOTT, Chief Judge, concurring in part and dissenting in part:
The single issue on which the original panel split was whether the Excess Plan would make up only the limitation of benefits Delaney received from the Retirement Plan as fixed by Section 415 of the Internal Revenue Code or the greater amount of that limitation of benefits required as a result the enactment of Section 401(a)(17). The parties and my colleagues have considered this particular dispute as one governed by the parole evidence rule, i.e., whether the Excess Plan is ambiguous or not and, if ambiguous, that parole evidence was admissible to explain its meaning.
I respectfully submit that the Excess Plan is not at all ambiguous, but it clearly incorporated the provisions of Section 401(a)(17).
One of the basic rules for the interpretation of a contract is found in LSA-C.C. art. 2050 which provides:
Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.
Applying this rule to the Excess Plan the following sections should be considered together in order to understand the meaning of the plan:
Section 2.1 PurposeThe Plan is designed to supplement the retirement benefits, disability benefits and death benefits actually paid to any Participant or Beneficiary under the Retirement Plan, and this Plan is equal to the benefit that would be payable under the general formula for the benefit provided in the Retirement Plan without considering the limitation of benefits stated in the Retirement Plan in accordance with Section 415 of the Code.
* * * * * *
Section 4.1 Amount of Benefits. The amount of the benefit payable under the Plan shall be equal to the difference between: (1) the amount of benefits that would be payable under the Retirement Plan as determined by the Administrative Committee under Section 4.3 computed as if the Retirement Plan did not contain the limitation on annual benefits expressed in Code § 415(b)(1)(A) (as adjusted under Code § 415(d)(1)(A)) (or any successor provisions thereto) ....
(emphasis supplied).
While the first quoted section refers only to Section 415 this section is only an expression of the general purpose of the plan. However, the second quoted section, which specifically refers to the amount of benefits, provides that such benefits will include not *722 only the limitation on the Retirement Plan benefits required by Section 415, but also those required by "any successor provisions thereto" which clearly encompasses the limitations required by Section 401(a)(17). When these sections of the Excess Plan are read together the only logical conclusion is that when Delaney began receiving benefits under the Excess Plan in 1994 his benefits were to be computed to make up for the limitation on the Retirement Plan benefits as a result of the enactment of Section 401(a)(17), a "successor provision" to Section 415.
Because of the foregoing conclusion, I respectfully dissent from the majority's disposition of the interest issue raised by Delaney. The majority opinion awards interest from date of judicial demand because the "precise amount of the claim at stake was not ascertainable until the court determined what was the most proper payment." I disagree. Whitney could easily have ascertained the correct amount to pay had they interpreted the contract correctly. I do not suggest that there was any bad faith here, only an error on their part. Interest should be computed from the date each payment became due.
ARMSTRONG, Judge, dissenting.
I respectfully dissent. I agree with the majority opinion that the $1,187,000 was not salary, but I disagree with the majority's conclusions as to the Excess Plan. The issue of whether a written contract is clear and explicit, and not ambiguous, is an issue of law and, as such, is subject to de novo review on appeal. Terrebonne Fuel & Lube, Inc. v. Placid Refining Co., No. 93-CA-2364 (La. App. 4th Cir. 10/2/96), 681 So.2d 1292, 1295, writ denied, No. 96-C-2625 (La.12/13/96), 692 So.2d 1066. If a written contract is clear and explicit, and not ambiguous, then its meaning is also subject to determination de novo on appeal. Id. I believe that the Excess Plan clearly, explicitly and unambiguously does not make up for any reductions in Retirement Plan benefits which are caused by IRC § 401(a)(17). Instead, the Excess Plan clearly, explicitly and unambiguously makes up for only those reductions in Retirement Plan benefits caused by IRC § 415. Indeed, IRC § 401(a)(17) was not even enacted until after the Excess Plan was adopted and, of course, is not even mentioned in the Excess Plan. A copy of the Excess Plan's Articles 2, 3 and 4 (which are also captioned Sections 2.1, 3.1 and 4.1) is attached hereto as an Appendix. As can be seen from that Appendix, Articles 2 and 3, which describe respectively the purpose of the Excess Plan and eligibility for participation in the Excess Plan, refer to IRC § 415 with no reference whatsoever to successor provisions. Article 4, also, does not make any reference to successor provisions to IRC § 415 generally. Instead, Article 4 makes reference to three specific portions of IRC § 415 and "successor provisions thereto" (emphasis added). The use of the word "thereto" limits the reference to "successor provisions" to those three specific portions of IRC § 415. Thus, Article 4's reference to "successor provisions" does not extend even as far as IRC § 415 generally, much less to the other sections of the IRC. More fundamentally, the phrase "successor provisions" necessarily connotes provisions which succeed (i.e. replace, displace or take the place of) the existing provisions. But, it does not appear that IRC § 401(a)(17) succeeded, replaced, repealed, amended or even directly affected IRC § 415 or any of the three specific portions of IRC § 415. Both IRC § 415 and IRC § 401(a)(17) are presently in the IRC and it appears that they were so as of the time of the events in question. Thus, IRC § 401(a)(17) is necessarily not a successor to IRC § 415.

APPENDIX

Article 2

PURPOSE OF THE PLAN
Section 2.1 Purpose. The Plan is designed to supplement the retirement benefits, disability benefits and death benefits actually paid to any Participant or Beneficiary under the Retirement Plan, so that the combined benefit payable under the Retirement Plan and this Plan is equal to the benefit that would be payable under the general formula for that benefit provided in the Retirement Plan, without considering the limitation of benefits stated in the Retirement *723 Plan in accordance with Section 415 of the Code.

Article 3

ELIGIBILTY
Section 3.1 Eligibility. Any Participant in the Retirement Plan who on or after January 1, 1984, is advised by the Administrative Committee that the Participant's benefits under the Retirement Plan are limited to a lesser amount than that provided by the general Retirement Plan formula as a result of the application of the limitation of benefits contained in Section 415 of the Code shall automatically become a Participant in this Plan.

Article 4

BENEFITS
Section 4.1 Amount of Benefits. The amount of the benefit payable under the Plan shall be equal to the difference between: (1) the amount of benefits that would be payable under the Retirement Plan as determined by the Administrative Committee under Section 4.3 computed as if the Retirement Plan did not contain the limitation on annual benefits expressed in Code § 415(b)(1)(A) (as adjusted under Code § 415(d)(1)(A)) or any successor provisions thereto) and the limitation in case of a defined benefit plan and a defined contribution plan for the same employee as expressed in Code § 415(e) (and any successor provisions thereto) determined at the time the Administrative Committee last advised the Participant of the unlimited Retirement Plan benefits as provided in Section 4.3 below and (2) the amount of benefits as actually computed and payable under the Retirement Plan because of the limitations imposed by Code § 415.

ON REHEARING
We deny rehearing in this matter but note the Plaintiff/Delaney is entitled to $6,993.00 from the Excess Plan per month from July 1, 1994, subject to credits for the monthly payments of $5,679.78 he has received since July 1,1994.